THANE D. SOMERVILLE, Wash. Bar No. 31468
FRANK R. JOZWIAK, Wash. Bar No. 9482
Morisset, Schlosser, Jozwiak & Somerville
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Telephone: 206-386-5200
Facsimile: 206-386-7322
E-mail: t.somerville@msaj.com
f.jozwiak@msaj.com
Attorneys for Plaintiff Quechan Indian Tribe

BRYAN R. SNYDER, Cal. Bar No. 125212
Law Office of Bryan R. Snyder
1245 Island Avenue
San Diego, California 92101
Telephone: 619-398-8379
Facsimile: 619-398-8377
E-mail: BSnyder@SDtrialattorney.com
Local Counsel for Plaintiff Quechan Indian Tribe

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, a federally recognized Indian Tribe,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; United States Bureau of Land Management; Ken Salazar, Secretary of the Interior; Robert Abbey, Director, Bureau of Land Management; Teri Raml, District Manager, BLM California Desert District; Margaret Goodro, Field Manager, BLM El Centro Field Office<br><br>Defendants | Civil Action No. '12CV1167 WQHMDD<br><br>COMPLAINT OF QUECHAN INDIAN TRIBE FOR DECLARATORY AND INJUNCTIVE RELIEF |



LAW OFFICES
MORISSET, SCHLOSSER, JOZWIAK &SOMERVILLE
801 Second Avenue, Suite 1115
Seattle, Washington 98104-1509
Tel: 206-386-5200 Fax: 206-386-7322

## I. INTRODUCTION

1. On May 11, 2012, the United States Department of the Interior executed a *Record of Decision for the Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan* (hereinafter, the "Ocotillo ROD").

2. The Ocotillo ROD was signed on May 11, 2012 by the Secretary of the Interior Ken Salazar and on May 9, 2012, by the Director of the Bureau of Land Management Robert Abbey and by the BLM El Centro Field Office Manager Margaret L. Goodro.

3. The Ocotillo ROD approves issuance of a right-of-way to a private corporation for the development of an industrial utility-scale wind power project (the "OWEF Project") on 10,151 acres of federal public lands (the "OWEF Project Area") that contain hundreds of archaeological sites (containing tens of thousands of individual artifacts) eligible and potentially eligible for inclusion in the National Register of Historic Places.

4. The OWEF Project Area is within the traditional territory of the Quechan Tribe and contains cultural and biological resources of significance to the Tribe and its members.

5. In addition to the specific archaeological sites and artifacts that have been identified to date, the public lands within the OWEF Project Area, in their entirety, are themselves of cultural significance to the Quechan Tribe and its members. As stated in correspondence to BLM State Director James Kenna from Quechan Vice-President Ronda Aguerro, dated December 9, 2011:

> "The Ocotillo Desert is part of the traditional Western Corridor for the Quechan Tribe and it is also an area of transition between the Quechan, Cocopah, Kumeyaay and Kamia/Desert Kumeyaay . . . . The area of the Ocotillo Desert holds tremendous spiritual essence for the Quechan Tribe. The [OWEF Project Area] lies at the bottom of the Coyote Mountain (Carrizo Mountain), which is an important cultural component to the Quechan cosmology. The importance of that mountain is recounted and held sacred in our Creation Story, songs, and other oral traditions. To allow a project of

such magnitude to be erected next to one of our sacred sites – which helps form our identity as Quechan – would be a desecration of our culture and way of life."

6. The lands within the OWEF Project Area and surrounding lands, as a whole, constitute a Traditional Cultural Property, which is eligible for inclusion in the National Register of Historic Places pursuant to the National Historic Preservation Act.

7. On February 13, 2012, the Quechan Tribe's Historic Preservation Officer informed BLM that:

> "the remaining [112] turbines would still obstruct the viewshed to Coyote Mountain from locations other than Spoked-Wheel Geoglyph, such as from the Indian Hills location. Second, the [112-turbine] Alternative neglects the viewshed towards the East to AVII'SHPA/WII'SHPA (Mount Signal) . . . . The Quechan Tribe assert that there is a spiritual connection between Coyote Mountain and WII'SHPA, and the imposition of any turbines between the two locations would not only interfere with this spiritual connection but it would detrimentally impact the ability of the Quechan people to spiritually interact and appreciate these sacred locations."

8. The Department of the Interior and its agency, the Bureau of Land Management (BLM), have known about the significance of the OWEF Project Area to Native American culture, religion, and values for decades.

9. The public lands that are the subject of the Ocotillo ROD are located within the California Desert Conservation Area (CDCA) and have been designated by Interior as Class L "Limited Use" lands. Class L lands are designated to "protect sensitive, natural, scenic, ecological, and cultural resource values" and are required to be "managed to provide for generally lower-intensity, carefully controlled multiple use of resources, while ensuring that sensitive values are not significantly diminished." California Desert Conservation Area Plan (CDCA Plan), at p. 13.

10. The proposed OWEF Project, if completed, would generate approximately 315 MW and would consist of 112 independent wind turbines, each of which stand approximately 450 feet tall. The diameter of the circle swept by each of the blades would be 371 feet. In addition, 42 miles of new, permanent, access and maintenance roads (at least 20 feet in width) would be constructed to access the towers. The OWEF Project would also include a substation; administration, operations and maintenance buildings and facilities; transmission lines; meteorological towers; temporary asphalt batch plant; parking areas; temporary construction lay down areas; a switchyard; and other necessary infrastructure.

11. The OWEF Project is only one of many large utility-scale renewable energy projects located on California desert lands that have recently been approved, or are under consideration for approval, by Interior, and which threaten scenic, cultural, and biological resources designated for protection under the CDCA Plan, especially on Class L lands.

12. Interior's approval of the Ocotillo ROD, issuance of a right-of-way, and amendment of the CDCA Plan, for the purpose of construction and operation of the OWEF Project on these specific Class L lands, while permitting the destruction of culturally and visually significant lands and resources, is unlawful.

13. The Tribe seeks a declaratory judgment that the United States Department of the Interior, the Bureau of Land Management, and their officials, officers and agents (collectively "Interior") have violated and are violating federal laws, regulations, and policies including the Federal Land Policy and Management Act (FLPMA); National Historic Preservation Act (NHPA); National Environmental Policy Act (NEPA); Administrative Procedures Act (APA); and the CDCA Plan by approving, executing, and implementing the Ocotillo ROD.

14. The Tribe seeks an order vacating the Ocotillo ROD including the Amendment to the CDCA Plan; an order permanently enjoining issuance of a right-of-way and Notice to Proceed for the OWEF Project on these Class L lands, and vacating such approvals or authorizations already granted.

15. To avoid irreparable injury to the Quechan Indian Tribe, the OWEF Project Area lands and the cultural and biological resources of concern pending completion of this litigation, the Tribe seeks a temporary restraining order and preliminary injunctive relief to enjoin any issuance of a right-of-way or Notice to Proceed, any ground-disturbing activities authorized under a Notice to Proceed, and any implementation of the Ocotillo ROD.

## II. JURISDICTION AND VENUE

16. This action presents claims arising under federal laws including the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq*., the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., the National Historic Preservation Act, 16 U.S.C. § 470 *et seq*., the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702, 28 U.S.C. § 1331, and 28 U.S.C. § 1362, as this matter is an action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior and arising under the Constitution, laws, or treaties of the United States.

17. Pursuant to 28 U.S.C. § 1391(e), venue is proper in this Court, the United States District Court for the Southern District of California, because this action relates to federal lands located within this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## III. PARTIES

18. Plaintiff Quechan Indian Tribe (herein, the "Tribe") is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior. The lands and resources of the Fort Yuma Indian Reservation were reserved to the Tribe through the Executive Order of January 9, 1884, as modified by Executive Order of December 19, 1900, and confirmed by Secretarial Orders of December 20, 1978, and February 6, 1981. 46 Fed. Reg. 11372, 11373 (1981).

19. By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

20. Defendants are the United States Department of the Interior; Bureau of Land Management; Ken Salazar, Secretary of the Interior; Robert Abbey, Director, Bureau of Land Management; Teri Raml, District Manager, BLM California Desert District; and Margaret Goodro, BLM Field Manager, El Centro Field Office.

21. Defendant United States Department of the Interior is responsible for administration and management of federal lands, including those lands under the jurisdiction of the Bureau of Land Management.

22. Defendant Ken Salazar is Secretary of the United States Department of the Interior and named herein in an official capacity.

23. Defendant Robert Abbey is Director of the United States Bureau of Land Management and named herein in an official capacity.

24. Defendant Teri Raml is District Manager of the United States Bureau of Land Management California Desert District Office and named herein in an official capacity.

25. Defendant Margaret Goodro is Field Manager of the United States Bureau of Land Management El Centro Field Office and named herein in an official capacity.

## IV. GENERAL ALLEGATIONS

### A. <u>Interest of the Quechan Tribe</u>

26. For thousands of years, the Quechan Tribe and tribal ancestors traditionally occupied, traveled, traded, and utilized resources within a broad geographical area located within the desert lands of modern-day Arizona and Southern California.

27. By Executive Order of January 9, 1884, President Arthur set aside approximately 45,000 acres of the Quechan's traditional land within the state of California as the Fort Yuma Indian Reservation for the Quechan Indian Tribe (the "Reservation"). The

Reservation is located along the Colorado River adjacent to present-day Yuma, Arizona. As a result of changes in the channel of the Colorado River, a portion of the Reservation now lies within the state of Arizona. The Reservation borders Baja California, Mexico to the south. There are approximately 3,500 members of the Quechan Tribe, many of whom live on the Reservation or in the town of Winterhaven, California and the city of Yuma, Arizona, both of which are contiguous to the Reservation boundaries.

28. The Tribe is unique because it is still located within a portion of its adjudicated traditional territory. The Tribe was not moved or conquered by Spain, Mexico, early Yuma settlers, or the United States, although the Tribe's original land base has been significantly diminished.

29. The Tribe's traditional territory extends beyond the Reservation's exterior boundaries, encompassing lands that are the subject of this action. The western traditional territory of the Tribe extended to the area surrounding California's Cahuilla mountains and encompasses the OWEF Project area.

30. Interior has acknowledged the traditional use of lands within and around the OWEF Project Area by Quechan ancestors, and ethnographic studies have documented the significance of the OWEF Project Area to Native Americans, including the Quechan Tribe.

31. Protection of the Tribe's cultural heritage is of significant importance to the Tribe. The Quechan Tribal Council, the governing body of the Tribe, established the Quechan Cultural Committee to promote, protect, and preserve Quechan culture, language, religion, history, and ancient sites and artifacts, and to advise the Tribe on matters relating to such things. The Committee includes tribal elders selected to protect Quechan history, identity, and spiritual practices. The Committee works closely with the Tribe's Historic Preservation Officer and the Tribal Council to ensure protection and preservation of cultural resources of significance to the Tribe, whether located within or outside Reservation boundaries.

32. The Tribe's cultural resources are historically and culturally interrelated and interconnected over many miles of desert land within the Tribe's traditional territory, within and outside the exterior boundaries of the Reservation.

33. Destruction or damage to any one cultural resource, site, or landscape contributes to destruction of the Tribe's culture, history, and religion. Injury to the Tribe's cultural resources causes injury to the Tribe and its people.

34. Cultural resources of significance to the Tribe are located on the lands that are the subject of this action and adjacent lands.

35. The cultural resources found in the OWEF Project Area reflect the repeated, annual migration of the Quechan Tribe, as they exercised cultural, spiritual, religious, and utilitarian practices on these lands.

36. In addition to the specific archaeological sites that have been identified to date, the public lands within the OWEF Project Area are culturally and spiritually significant and qualify, as a whole, as a Traditional Cultural Property of the Quechan Tribe under the NHPA. 36 C.F.R. § 800.16(l)(1) (defining "historic property" to include "properties of traditional religious and cultural importance to an Indian tribe . . . and that meet the National Register criteria").

37. The Tribe has expressed its concern to Interior through oral and written comments with regard to protection and preservation of the lands and resources located within the OWEF Project Area.

38. The comments of the Quechan Tribe were not included or addressed by Interior in the Final Environmental Impact Statement.

39. The Tribe, at the direction of the Tribal Council and support of the Cultural Committee, has attempted to actively participate in the administrative process relating to the OWEF Project to identify the importance of the OWEF Project Area and to advocate for preservation of the OWEF Project Area in a manner consistent with FLPMA, the CDCA Plan,

the NHPA, and other federal cultural resource protection laws, regulations, and policies; however, such participation has been impaired by Interior's failure to exchange and share information with the Tribe, and Interior's failure to consider or incorporate the Tribe's comments and concerns in the planning process.

40. The Tribe's interest in this action is not limited to cultural preservation. The Tribe and its members also have an interest in preserving the quality of the land, water, air, fauna, and flora within the Tribe's traditional territory, within and outside the Reservation. For example, the Tribe is concerned with impacts to the habitat of the Flat Tailed Horned Lizard on lands proposed for development, as the lizard is a central part of the Tribe's Creation Story.

**B. <u>Additional General Allegations</u>**

41. On March 9, 2012, Interior published a Final Environmental Impact Statement/Final Environmental Impact Report (FEIS) for the OWEF Project.

42. The FEIS confirms that the OWEF Project is proposed for development in an area of high cultural sensitivity. The FEIS reports that 287 archaeological sites were identified during surveys in the Area of Potential Effects for the OWEF Project. FEIS, at 4.4-9.

43. Each of the individual archaeological sites encompasses large areas of land; for example, Site CA-IMP-008/H has dimensions of 4024 meters by 1610 meters; Site CA-IMP-103/H measures 1170 meters by 1180 meters; Site CA-IMP-6988 measures 920 meters by 410 meters.

44. Each of the individual archaeological sites contains numerous individual artifacts and it is estimated that thousands, potentially tens of thousands, of individual artifacts are located within the OWEF Project Area.

45. The OWEF Project Area contains geoglyphs, petroglyphs, sleeping circles, milling features, agave roasting pits, ceramics (including unusual painted and stucco) and rare artifacts (such as anvil and crescentic).

46. Other resources of significance to Native American culture, religion and values are located in the OWEF Project Area including 24 pre-historic trail segments and at least six identified burial sites.

47. Recent field visits to the OWEF Project Area have discovered the existence of additional sites and resources, including burial sites, that were not identified by BLM or the applicant in their surveys, including resources in designated direct impact areas.

48. The likelihood for future discovery of additional resources, including additional burial sites, is high.

49. Avoidance of the identified sites and artifacts is not required as a mitigation measure in the Ocotillo ROD or related approvals, avoidance is only "preferred" and only "where feasible."

50. Construction of the current OWEF Project design without direct impact to sites and artifacts will be impossible.

51. The FEIS reports that the OWEF Project Area, in its entirety, may be eligible for inclusion in the National Register as a Traditional Cultural Property; however, to date no evaluation for eligibility has been completed by Interior in conformance with the NHPA.

52. Construction of the OWEF Project will destroy the characteristics of the Traditional Cultural Property, including viewsheds to sacred mountains.

53. The Ocotillo ROD confirms that "the Refined Project will, even after implementation of the measures in the MOA, still have an unmitigated adverse effect on resources that are spiritually and culturally significant to affected Tribes." ROD, ES-3.

54. Interior published its Proposed Plan Amendment (PPA) on March 9, 2012.

55. In the PPA, Interior proposed to amend the CDCA Plan to designate the OWEF Project lands as suitable for wind energy development.

56. In the PPA, FEIS, and Ocotillo ROD, Interior did not consider or evaluate whether development of an industrial-scale power project, consisting of 112 wind turbines and

associated infrastructure (including 42 miles of roads) constitutes a "lower-intensity" use as required by the Class L land use designation in the CDCA Plan.

57. In the PPA, FEIS, and Ocotillo ROD, Interior failed to analyze whether other Class M or Class I lands within the CDCA could accommodate the applicant's project.

58. In the PPA, FEIS, and Ocotillo ROD Interior failed to analyze whether the OWEF Project and PPA would be consistent with state and local zoning and land use laws and whether the PPA conformed to the Plan Amendment Criteria of the CDCA Plan.

59. On April 6, 2012, the Tribe filed a written protest of the PPA pursuant to 43 C.F.R. § 1501.5-2, objecting that the PPA, and the approval of the OWEF Project on these Class L lands, would result in permanent damage and destruction to cultural and biological resources in conflict with the applicable Class L land use designation, and other objections relating to the underlying NEPA and NHPA administrative process.

60. On April 24, 2012, the California State Historic Preservation Officer informed BLM State Director James G. Kenna via written correspondence that he was so "concerned and troubled with the process being followed [by BLM] to approve renewable energy undertakings in California," that he would not execute any further agreement documents with BLM until the issues of concern raised in his correspondence are addressed.

61. On April 24, 2012, the Advisory Council on Historic Preservation wrote BLM State Director Kenna and identified a number of concerns with approval of the OWEF Project and BLM's process under the NHPA. The letter described BLM's schedule for Section 106 consultation as "aggressive."

62. Although the Ocotillo ROD states that BLM Director Robert Abbey has "resolved all protests," the Tribe has not yet received a copy of any final decision regarding its protest. The Tribe assumes that its protest has been denied.

63. The Ocotillo ROD signed by Director Abbey on May 9, 2012, and by Secretary Salazar on May 11, 2012, stated that the ROD was the final decision of Interior and that any review of the Ocotillo ROD must occur in federal district court.

64. Interior arbitrarily placed the OWEF Project on an artificial "fast-track" in order to achieve the applicant's goal of obtaining publicly-funded financial benefits from the federal government, which will likely expire at the end of 2012.

65. Interior arbitrarily set a project approval deadline of May 2012 and unlawfully rushed the NEPA and Section 106 process to meet that goal, failing to adequately evaluate the impacts associated with the OWEF Project, in order to reach a pre-determined approval decision.

66. The Secretary of the Interior Ken Salazar has been quoted in recent media reports as stating that his Department's current approach to renewable energy development is so aggressive that it is "on steroids."

67. Despite Interior and the applicant's aggressive efforts to "fast-track" the review of the OWEF Project, Congress did not waive or limit the applicability of any federal laws or regulations related to compliance with NEPA, the NHPA, FLPMA, or other laws with regard to the OWEF Project. Full compliance with applicable federal laws is mandatory.

68. The decision to approve the OWEF Project, the Ocotillo ROD, and the Amendment to the CDCA Plan will directly result in the imminent and permanent destruction of archaeological and cultural sites, culturally significant lands and viewsheds, and the habitat of sensitive biological species.

## V. CLAIMS FOR RELIEF

### CLAIM ONE: The Ocotillo ROD and CDCA Plan Amendment Violate the FLPMA, the APA, and the CDCA Plan.

69. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

70. In 1976, Congress passed the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., to direct management and administration of federally-owned public lands in the United States.

71. In FLPMA, Congress identified one specific area for special management prescriptions, the California Desert Conservation Area. 43 U.S.C. § 1781.

72. Congress demanded a plan for "the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." 43 U.S.C. § 1781(b).

73. Pursuant to Congressional mandate, the Department of the Interior prepared the California Desert Conservation Area Plan in 1980. 43 U.S.C. § 1781(d).

74. The CDCA Plan divides the public lands within the CDCA into four "classes" – Class C, Class L, Class M, and Class I. "Class L (Limited Use) protects sensitive, natural, scenic, ecological, and cultural resource values. Public lands designated as Class L are managed to provide for generally lower-intensity, carefully controlled multiple use of resources, while ensuring that sensitive values are not significantly diminished." CDCA Plan, at p. 13. "Class M (Moderate Use) is based upon a controlled balance between higher intensity use and protection of public lands . . . [providing] for a wide variety of present and future uses such as mining, livestock grazing, recreation, energy, and utility development." *Id.* "Class I is an 'Intensive use' class. Its purpose is to provide for concentrated use of lands and resources to meet human needs." *Id.*

75. Nearly four million acres of land within the CDCA is designated for Moderate or Intensive Uses under Class M or Class I, while nearly 6 million acres of land within the CDCA is designated for Limited Use under Class L.

76. The CDCA Plan does not prohibit the use of Class L lands for wind energy, but wind energy development is permissible on Class L lands only if it qualifies as a "lower-

intensity, carefully controlled multiple use of resources, while ensuring that sensitive values are not significantly diminished." CDCA Plan, p. 13.

77. The CDCA Plan further makes clear that consumptive uses on Class L lands are allowed "only up to the point that sensitive natural and cultural values might be degraded." CDCA Plan, p. 21.

78. Within the CDCA, moderate or higher-intensity renewable energy developments, and other projects where sensitive desert resources might be degraded, (like the OWEF Project) are restricted to Class M or Class I lands.

79. There is substantial land available for renewable energy development on Class M lands. Over the last eighteen months, Interior has approved, or is considering approval of, numerous large-scale renewable energy projects on Class M lands including but not limited to the Calico, Lucerne Valley, Genesis, Desert Sunlight, Palen, McCoy, and Desert Harvest Projects. The renewable energy projects named in this paragraph would cover approximately 26,000 acres of BLM Class M lands.

80. The OWEF Project proposes to construct 112 wind turbines, in addition to 42 miles of roads, and other buildings and support infrastructure necessary to operate and maintain the turbines over an area of 10,151 acres of Class L lands.

81. The OWEF Project is not a lower-intensity use of CDCA lands, and would significantly diminish and degrade sensitive, scenic, natural, and cultural values, and is thus prohibited on Class L lands in the CDCA.

82. The OWEF Project will necessarily result in the degradation of scenic and culturally significant public lands designated as Class L under the CDCA Plan, and will impact cultural resources eligible for listing under the NHPA, as well as habitat of sensitive biological species including but not limited to the Flat Tailed Horned Lizard.

83. Maps of the OWEF Project Area, developed by Interior in 1980 as part of the CDCA Plan, identifies the OWEF Project Area lands as "concentrated, sensitive areas of

traditional Native American secular and religious use" and as part of a "cultural resource area[s] of known and predicted area[s] of sensitivity and significance which are most vulnerable to negative impact."

84. In the FEIS, Interior admits that approval of the OWEF Project and Plan Amendment will result in impacts that will directly impair traditional and spiritual native values. This is also confirmed and admitted in the Ocotillo ROD.

85. Interior also concedes that the OWEF Project will degrade the scenic values of the Class L lands in the OWEF Project Area.

86. Interior's decision to approve the Plan Amendment to the CDCA Plan, and its decision to authorize development of the OWEF Project on these Class L lands, violates the letter, spirit, and intent of the CDCA Plan, violates FLPMA, and constitutes arbitrary, capricious action, an abuse of discretion, and unlawful conduct under the Administrative Procedures Act (APA).

87. Interior's decision to approve the Plan Amendment, and its decision in the Ocotillo ROD to authorize development of the OWEF Project on these Class L lands, failed to "give full consideration to Native American values in land use planning and management decisions" as required by the CDCA Plan.

88. In a previous case, *Quechan Tribe of the Fort Yuma Indian Reservation v. United States Department of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010), the Court found that the Tribe's FLPMA claim, which similarly challenged Interior's fast-track approval of a utility-scale solar project on sensitive Class L lands located nearby the OWEF Project Area, raised "serious questions" for the purposes of injunctive relief. *Id.* at 1120.

89. The OWEF Project is not consistent with the state and local land use laws, plans, and zoning requirements for Imperial County and the Ocotillo/Nomirage Area and thus the OWEF Project is not permissible under the CDCA Plan Decision Criteria for Energy Production.

90. The CDCA Plan Amendment fails to satisfy the Plan Amendment Criteria found in the CDCA. Thus, the Plan Amendment violates both the CDCA Plan, FLPMA, and the decision-making requirements of the APA.

91. Interior conducted its analysis of the Ocotillo ROD and Plan Amendment in an arbitrary and capricious manner in violation of the APA, failed to engage in reasoned decision-making, and failed to rationally analyze factors required for consideration by the CDCA Plan.

92. As a result of these violations, the Court should vacate the Ocotillo ROD, including the right-of-way, notice to proceed, and the Amendment to the CDCA Plan, and permanently enjoin development of the OWEF Project on these Class L lands.

**CLAIM TWO: The OWEF Project Will Result in Undue Impairment and Unnecessary and Undue Degradation of the Public Lands In Violation of FLPMA.**

93. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

94. The Secretary of the Interior is required to manage the public lands in a manner that prevents "permanent impairment" of the lands and to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. §§ 1702(c); 1732(b).

95. With specific regard to the lands in the CDCA, Congress also prohibits any "undue impairment" of the CDCA lands. 43 U.S.C. § 1781(f).

96. Interior has defined "unnecessary and undue degradation" as conditions, activities, or practices that: "fail to comply with . . . Federal and state laws related to environmental protection and protection of cultural resources" and that "fail to attain a stated level of protection . . . required by specific laws in areas such as the California Desert Conservation Area." 43 C.F.R. § 3809.5.

97. The OWEF Project will result in undue impairment, and undue and unnecessary degradation, of lands that are designated for heightened resource protection as Class L lands in

the CDCA Plan and which are governed by, at minimum, Class III Visual Resource Management standards.

98. Approval of the OWEF Project will permanently degrade and destroy culturally significant lands that qualify as a Traditional Cultural Property, will destroy a significant scenic viewshed, and will destroy habitat for sensitive biological species on lands that have been affirmatively designated and set aside for only low-intensity uses. Once the desert surface is damaged, such damage will be permanent and rehabilitation of the lands and sensitive resources will not be possible. Approval of the OWEF Project constitutes unnecessary and undue degradation in violation of FLPMA.

**CLAIM THREE: Interior Violated NEPA By Failing to Conduct an Adequate Analysis of Cumulative and Indirect Effects.**

99. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

100. Pursuant to NEPA, an Environmental Impact Statement must thoroughly analyze the "cumulative impact" of the federal agency's proposed action. 40 C.F.R. § 1508.7; 40 C.F.R. § 1508.25(a)(2).

101. An Environmental Impact Statement must also thoroughly analyze indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Such indirect effects may include growth inducing and other effects related to induced changes in the pattern of land use. 40 C.F.R. § 1508.8.

102. A cumulative impact analysis must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment. General statements in the FEIS about "possible effects" and "some risk" do not constitute a thorough analysis. Quantified, detailed information analyzing the cumulative impacts is required.

103. Interior has recently reported that approximately one million acres of land are proposed for foreseeable solar and wind energy utility development on California desert lands.

104. Interior has approved, and is considering for approval, numerous utility-scale solar and wind energy projects for development on Class L lands in the CDCA; however, the legality of such approvals has not been directly ruled on by any court to date.

105. Interior's "fast-track" approvals of utility-scale renewable energy projects on Class L lands, including but not limited to the Blythe and Ivanpah Solar Projects located on CDCA Class L lands are already having a devastating impact on the cultural values intended to be protected on such lands.

106. The FEIS lists dozens of projects that are currently proposed for development within and around the CDCA that will impact resources within that management unit.

107. The FEIS lacks substantive analysis of the cumulative impact that will occur to Class L lands in the CDCA, and the sensitive, natural, scenic, ecological, and cultural resource values intended to be protected on Class L lands, as a result of extensive current and future development of renewable energy and other projects on Class L lands in the CDCA.

108. The FEIS fails to provide substantive analysis about how the development of the OWEF Project, in conjunction with the numerous other existing and foreseeable projects, will impact cultural, biological, or scenic resources on desert lands within the California Desert Conservation Area, especially on those lands designated as Class L.

109. In violation of NEPA, the FEIS provides only conclusory statements about cumulative impacts, without providing substantive analysis of how the numerous proposed energy developments, and associated transmission lines, roads, and support facilities, will affect cultural, biological, and scenic resources on desert lands within the CDCA.

110. The scope of the cumulative impacts review, as it relates to cultural, biological, and visual resources, is limited to an arbitrary and unreasonably narrow geographic area.

111. The FEIS also fails to disclose or discuss the likelihood that approval of the OWEF Project may lead to the cumulative and/or indirect effect of additional development of the surrounding area by wind or other renewable energy projects.

112. Due to the inadequate analysis of cumulative and indirect effects, the FEIS and the Ocotillo ROD are unlawful and must be vacated, and the FEIS remanded back to Interior for further analysis required by NEPA.

**CLAIM FOUR: Interior's Approvals and Analysis Relating to Visual Resources Management Violated FLPMA, NEPA, and the APA.**

113. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

114. The Federal Land Policy and Management Act, 43 U.S.C. § 1701(a)(8) provides that " . . . the public lands be managed in a manner that will protect the quality of the . . . scenic . . . values . . . ." *See also* 43 U.S.C. § 1702(c) (identifying "scenic values" as one of the resources for which public lands shall be managed); 43 U.S.C. § 1711(a) (requiring the Secretary to prepare and maintain an inventory of all public lands and their resource and other values (including scenic values)); 43 U.S.C. § 1765(a) (requiring that each right-of-way shall contain terms and conditions which will minimize damage to scenic values).

115. Preservation of the viewshed between Coyote Mountain, Sugarloaf Mountain, Mt. Signal, and the archaeological site "Indian Hills" is extremely important to the Quechan Tribe. This viewshed is a critical component of the Traditional Cultural Property.

116. Developing the OWEF Project, and its 112 turbines, in this viewshed would detrimentally impact the ability of the Quechan people to spiritually interact and appreciate these sacred locations.

117. Interior protects the scenic values of public lands through development of Visual Resource Management (VRM) classifications.

118. The Visual Resources Management Program is incorporated into the CDCA Plan.

119. Once Interior establishes a VRM class for an area, all future agency management decisions must meet the objectives for the VRM classes in the area.

120. In the FEIS, p. 3.19-2, Interior states: "VRM Class designations set the level of visual change to the landscape that may be permitted for any surface-disturbing activity."

121. When a project is proposed and there are no Resource Management Plan-approved VRM objectives, Interim VRM Classes must be established. FEIS, Appendix E-2-2.

122. The FEIS provides that: "the land area encompassing the OWEF project area is to be managed in accordance with Interim VRM Class III objectives." FEIS Table 3.19-1, p. 3.19-8.

123. Appendix E-2 of the FEIS states: "For the Proposed Project, the Interim VRM Classes was determined to be VRM Class II and VRM Class III."

124. The VRM Class II Management Objective requires that a project or action "retain the character of the existing landscape. The level of change to the characteristic landscape should be low. Management activities may be seen but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape." FEIS, Appendix E-2.

125. The VRM Class III Management Objective requires that a project or action "partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate or lower. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape." FEIS, at 3.19-2.

126. The Visual Resources Analysis, found in Appendix E-1 of the FEIS, states that the applicable VRM for the OWEF Project Area is Class III Management, that the level of change from the Key Observation Points resulting from development of the OWEF Project would be "Moderate" to "High", and that the proposed OWEF Project (FEIS Alternatives 1

through 3) is not consistent with the VRM Class III Management designation. The analysis describes the impact of the OWEF Project as "significant."

127. The Visual Resources Analysis, in Appendix E-1, states:

"The Proposed Project would result in the introduction of visually prominent built structures into a landscape generally lacking similar built features of industrial or technological character. . . . The [Proposed Project's] high level of change would not meet the VRM Class III objective of a moderate (or lower) degree of visual change." A Project that fails to meet Class III VRM objectives would also fail to meet the more restrictive VRM Class II objectives.

128. Scenic values are required to be protected and preserved on Class L lands. In managing Class L lands, Interior must ensure that protected scenic values are not significantly diminished.

129. In a Draft EIS published by Interior in April 2012 for the Ocotillo Solar Project, proposed for development on Class L lands in the vicinity of the proposed OWEF Project, Interior states: "For Multiple Use Class L visual management prescriptions, the VRM Class with closely corresponding visual management objective is Class III." Ocotillo Solar DEIS, April 2012, p. 3-88. In this Draft EIS document, Interior confirmed that the appropriate VRM Class designation for this area is Class III.

130. Approving a Proposed Project that is not consistent with binding VRM objectives violates FLPMA and is prohibited.

131. Although the Project Area is to be managed in accordance with, at minimum, VRM Class III objectives, Interior's discussion of the visual resources impacts in the Environmental Consequences section of the FEIS erroneously or arbitrarily contends that the Project is subject to a Class IV Management objective, which would allow greater disturbance than Class II or III.

132. Interior concedes in the FEIS, p. 4.18-2, that "this level of wind development [the OWEF Project] can only conform with interim class IV objectives."

133. Interior's failure to evaluate the environmental consequences of approving the OWEF Project in a Class III VRM area violates NEPA, because it fails to take the required "hard look" at the impacts of the project on the applicable VRM objectives and fails to provide the decision makers and the public with accurate information about the impacts on the applicable VRM designations.

134. To the extent that Interior determined the OWEF Project would be consistent with the applicable Interim Class III VRM designation, that determination is arbitrary, capricious, an abuse of discretion, and not in compliance with law, in violation of the APA.

135. The FEIS also confirms that the Proposed Project would violate and not be consistent with the visual management guidelines and objectives of the Anza-Borrego Desert State Park and the Imperial County General Plan. FEIS, at 3.19-9.

**CLAIM FIVE: Interior Violated NEPA, FLPMA, and the APA by Failing to Take a "Hard Look" At Whether the OWEF Project and CDCA Plan Amendment Are Consistent with the Requirements of the CDCA Plan, and State and Local Land Use and Environmental Laws.**

136. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

137. The CDCA Plan Decision Criteria for Energy Production requires that projects "conform to local plans wherever possible." CDCA Plan, p. 93.

138. The CDCA Plan Decision Criteria for evaluation of a proposed plan amendment requires BLM to determine that the CDCA Plan Amendment is in accordance with applicable laws and regulations.

139. Interior's Right-of-Way Regulations, enacted pursuant to FLPMA, require BLM, before issuing a grant of right-of-way to determine whether the proposed use of lands will comply with applicable Federal and state laws. 43 C.F.R. § 2804.25(d)(2). Any right-of-

way must be conditioned upon full compliance with applicable federal and state laws and regulations, including facility siting standards. 43 C.F.R. § 2805.12(a), (i)(2), (6).

140. The OWEF Project is not compliant with CEQA, nor is it compliant with the Imperial County General Plan, zoning laws of Imperial County, and the Ocotillo/Nomirage Community Area Plan.

141. 40 CFR § 1506.2(d) requires evaluation in the FEIS of any inconsistency that a Federal action will have with local land use plans and laws and where an inconsistency exists, the FEIS must describe the extent to which the agency would reconcile the proposed project with local law. The FEIS here fails to comply with this regulation.

142. Where a federal agency proposes to approve a project that is inconsistent with local zoning laws, additional scrutiny must be given to the project in the FEIS under NEPA.

143. In the FEIS, BLM fails to acknowledge or consider the fact that the OWEF Project is not consistent with CEQA, state and local land use law, the Imperial County General Plan, the applicable Imperial County zoning requirements/designations, or the Ocotillo/Nomirage Community Area Plan.

144. The failure to consider whether the Plan Amendment and proposed OWEF Project are consistent with state and local law renders the FEIS, Right-of-Way and Plan Amendment invalid.

145. The FEIS also fails to evaluate whether the CDCA Plan Amendment is consistent with the Plan Amendment Criteria found in the CDCA Plan. In this case, the Plan Amendment is not consistent with the CDCA Plan Amendment Criteria and the failure to analyze the criteria renders the FEIS and Plan Amendment invalid. Failure to ensure that the Plan Amendment comports with the CDCA Plan Amendment criteria also violates FLPMA.

**CLAIM SIX: Interior Violated NEPA by Failing to Adequately Study, Identify, and Evaluate the Significance of the Affected Cultural Environment and the Impacts Thereto.**

146. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

147. NEPA requires Interior to identify the affected environment and take a "hard look" at the direct and indirect environmental consequences of its proposed action, in advance of approving the action.

148. Interior prepared its Draft and Final EIS, and made its approval decision without adequately identifying, evaluating, or consulting about, the significance of the cultural resources that exist within the OWEF Project Area in terms of eligibility for inclusion in the National Register and in terms of cultural significance to the Quechan Tribe and other affected Indian tribes. Interior also failed to adequately evaluate whether resources would be subject to project impacts.

149. Resource surveys and site identification efforts were arbitrarily limited by Interior or the project applicant.

150. Despite repeated requests, Interior failed to conduct ethnography, prehistoric trails, and regional synthesis studies that would have provided critical information to the decision-makers about the cultural significance of the OWEF Project Area.

151. Other critical studies addressing the significance of the OWEF Project Area to the Quechan Tribe and other Indian nations were not prepared until after release of the FEIS and were not subject to comment or consultation by the Quechan Tribe.

152. Interior also approved the OWEF Project prior to completing an evaluation of whether the Project lands as a whole are eligible for listing and protection as a Traditional Cultural Property.

153. Interior's approval of the OWEF Project prior to identifying and evaluating the cultural significance of the affected resources, and without providing that information to the decision-makers and affected public in advance of a decision, violates NEPA.

154. Interior also failed to adequately evaluate the impact of noise and visual pollution on cultural resources and Native American values.

**CLAIM SEVEN: Interior Violated NEPA By Failing to Prepare a Programmatic EIS Regarding Renewable Energy Development in the California Desert Conservation Area Prior to Approval of the Ocotillo ROD.**

155. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

156. NEPA requires Interior to prepare a Programmatic Environmental Impact Statement (PEIS) where it proposes a program or series of connected, similar, or cumulative actions.

157. Interior has engaged in a concerted and systemic effort to approve applications for large, utility-scale solar projects on lands within the California Desert Conservation Area, including on Class L lands.

158. Interior has previously prepared a broad PEIS relating to Wind Energy Development in 11 Western States and is currently preparing a broad PEIS relating to Solar Energy Development in 6 Western States. However, Interior continues to approve individual large-scale renewable energy projects (wind and solar) in the specially protected California Desert Conservation Area, and specifically on Class L lands in the CDCA, without adequately analyzing the cumulative effects of its development approvals on the resources of the CDCA.

159. Interior has violated NEPA by approving the Ocotillo ROD without considering the overall and cumulative environmental effects of its program of renewable energy development on CDCA resources in a single comprehensive PEIS.

160. Interior is also violating NEPA and FLPMA by continuing to process and approve individual renewable energy projects prior to completion of a PEIS that evaluates the impacts of renewable energy development in the CDCA.

161. The Ocotillo ROD must be vacated and this matter remanded to Interior for completion of a complete Programmatic Environmental Impact Statement on Interior's program of renewable energy development within the California Desert Conservation Area.

**CLAIM EIGHT: Interior Violated the NHPA By Executing the Ocotillo ROD Prior to Completion of the Section 106 Process.**

162. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

163. Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, requires that agencies of the United States "shall, prior to approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of the license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register."

164. Like NEPA, the NHPA is designed to ensure that federal decision-makers thoroughly evaluate and address the impacts of their proposed actions on NHPA-eligible resources prior to taking final action.

165. Prior to approval of a federal undertaking, the agency must: (a) identify the "historic properties" within the area of potential effects; (b) evaluate the potential effects that the undertaking may have on historic properties; and (c) resolve the adverse effects through the development of mitigation measures. 36 C.F.R. §§ 800.4; 800.5; 800.6. Throughout all of these processes, the agency must consult at each stage with Indian tribes that attach religious and cultural significance to properties within the affected area. 36 C.F.R. § 800.3(f)(2); 800.4(a)(4); 800.5(c)(2)(iii); 800.6(a); 800.6(b)(2).

166. Interior did not complete the steps of the Section 106 process or the necessary consultations, as described in the preceding paragraph, prior to executing the Ocotillo ROD. For example, Interior has deferred final evaluation of the significance of identified resources, and their eligibility for inclusion in the National Register, until after Project approval. Development of plans relating to management and avoidance of impacts has also been deferred to post-Project approval.

167. Interior did not consult the Quechan Tribe with regard to determining the NHPA-eligibility of cultural sites, with regard to evaluating the potential impacts, and with

regard to resolving adverse effects. Thus, Interior has violated the NHPA, and the Ocotillo ROD must be vacated and remanded to Interior pending completion of the Section 106 process.

168. The failure to complete the required steps of the Section 106 process prior to issuing the Ocotillo ROD warrants preliminary injunctive relief. *Quechan Tribe of the Fort Yuma Indian Reservation v. United States Department of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010).

169. Interior has failed to fulfill its obligation to meaningfully consult with the Tribe in the Section 106 process. The agency must recognize the government-to-government relationship between the Federal Government and Indian tribes, and consultation with tribes is to be conducted in a manner sensitive to the concerns and needs of the Indian tribe. 36 C.F.R. § 800.2(c)(2)(ii)(C).

170. Interior also failed to consult with the Tribe in compliance with the Department of the Interior's Policy on Consultation with Indian Tribes (December 1, 2011), which, like the Section 106 regulations, requires consultation to commence early and continue throughout the administrative process, requires sharing of information, and requires consultation with the actual decision-maker, here, the Secretary of the Interior and the BLM Director. Interior has rejected or ignored Quechan requests for meetings with the decision-makers.

171. Interior repeatedly failed to timely provide the Tribe with information critical to the consultation process precluding the Tribe from engaging in meaningful consultation.

172. Interior declined tribal requests for extensions in comment periods, despite waiting until the very end of the administrative process to provide critical documents to the Tribe, including the Revised Draft MOA relating to cultural resources, the Historic Properties Treatment Plan, the NAGPRA Plan of Action, the Long Term Management Plan, and the Archeological Monitoring Post-Review Discovery Plan. These extensive and important documents were also provided at the same time that Interior requested comments on the Revised Archaeological Reports and the FEIS. Interior failed to timely provide these

documents to the Tribe and failed to allow a meaningful opportunity for the Tribe to comment, consult, and participate in the preparation of such documents.

173. Rather than allowing adequate time for consultation and completion of the Section 106 process, Interior aggressively pushed for completion of the administrative process and project approval by its arbitrary completion date of May 2012.

174. Interior's unlawful failure to complete the Section 106 process prior to execution of the Ocotillo ROD violates the NHPA and requires that the Ocotillo ROD and related authorizations be vacated and remanded for completion of the Section 106 process.

**CLAIM NINE: Interior Violated the APA Through Its Arbitrary, Capricious, and Unlawful Actions**.

175. The Tribe hereby incorporates, re-states, and re-alleges all preceding paragraphs.

176. The Administrative Procedures Act ("APA"), 5 U.S.C. § 706, requires a reviewing court to hold unlawful and set aside agency actions, findings, and conclusions, which are arbitrary, capricious, an abuse of discretion, or not in accordance with law.

177. Interior's actions and omissions identified in this Complaint constitute arbitrary, capricious, and unlawful decisions in violation of the APA.

178. Interior's approvals of the Ocotillo ROD are arbitrary, capricious, an abuse of discretion and not in accordance with law, because the decisions authorize an industrial, utility-scale, high-intensity energy project on scenic and culturally-sensitive Class L lands that permit only lower-intensity uses. Interior failed to evaluate or consider whether the OWEF Project is a "lower-intensity" use permissible on Class L lands.

179. Interior's determination that the OWEF Project is permissible on Class L lands, despite confirmation through its own analysis that the Project would significantly diminish and degrade sensitive natural, scenic, cultural and biological resources is arbitrary and capricious.

180. Interior's analysis and approvals relating to applicable Visual Resource Management requirements and objectives are arbitrary, capricious, an abuse of discretion and not in accordance with law.

181. Interior arbitrarily and unlawfully applied factors, guidelines, and decision-criteria in the CDCA Plan; for example, Interior failed to evaluate whether any alternative locations in the CDCA (e.g., locations on Class M or Class I lands) are available. Interior also ignored decision-criteria that mandate "avoidance of sensitive resources wherever possible" and "conformance to local land use plans wherever possible." See CDCA Plan, pages 93 (decision criteria) and 121 (analysis of proposed amendments and decision-criteria).

182. Interior's denial of the Tribe's April 6, 2012 protest was arbitrary, capricious, an abuse of discretion and not in accordance with law.

183. Interior's execution of the Ocotillo ROD without completing a valid impacts analysis in accordance with NEPA is arbitrary, capricious, an abuse of discretion and not in accordance with law.

184. Interior's execution of the Ocotillo ROD prior to completing a Programmatic Environmental Impact Statement on the impacts of Interior's concerted and systemic program of renewable energy development in the CDCA is arbitrary, capricious, an abuse of discretion and not in accordance with law.

185. Interior's execution of the Ocotillo ROD without completing a valid evaluation of the significance of the affected cultural resources and of the impacts on NHPA-eligible resources in compliance with the requirements of NEPA and Section 106 of the NHPA is arbitrary, capricious, an abuse of discretion and not in accordance with law.

186. Interior's approval of the Ocotillo ROD and Amendment to the CDCA Plan are also agency actions undertaken without compliance with procedures required by law.

187. The Tribe has no plain, speedy, and adequate remedy in the course of law and, absent immediate judicial intervention, the Tribe will suffer irreparable injury.

## VI. PRAYER FOR RELIEF

WHEREFORE, incorporating, re-stating, and re-alleging all preceding paragraphs, the Plaintiff Quechan Indian Tribe prays for judgment as hereinafter set forth:

188. For a judgment declaring that Interior violated FLPMA, the APA, NEPA, the NHPA, and the CDCA Plan by approving the Amendment to the California Desert Conservation Area Plan;

189. For a judgment declaring that Interior violated FLPMA, the APA, NEPA, the NHPA, and the CDCA Plan by executing the Ocotillo ROD and authorizing development of the OWEF Project on these Class L lands;

190. For a judgment declaring that Interior violated FLPMA and the APA by authorizing conduct that constitutes undue impairment of CDCA lands, and unnecessary and undue degradation of public lands;

191. For a judgment declaring that Interior violated FLPMA, NEPA, and the APA by authorizing development of the OWEF Project in a Class III Visual Resource Management Area;

192. For a judgment declaring that Interior violated NEPA and the APA by failing to prepare an adequate analysis of cumulative and indirect effects in its FEIS prior to execution of the Ocotillo ROD, by failing to consider whether the OWEF Project and CDCA Plan Amendment are consistent with the requirements of the CDCA Plan, by failing to prepare a Programmatic EIS relating to renewable energy development within the CDCA; and by failing to take a "hard look" at the impacts of the OWEF Project on affected cultural and scenic resources;

193. For a judgment declaring that Interior violated the NHPA and the APA by failing to complete the Section 106 process, and by failing to meaningfully consult with the Quechan Tribe, prior to execution of the Ocotillo ROD;

194. For a judgment that Interior engaged in conduct that is arbitrary, capricious, an abuse of discretion, and unlawful, and failed to engage in reasoned decision-making, in violation of the APA;

195. For an order vacating the Ocotillo ROD and the Amendment to the California Desert Conservation Area Plan and any related authorizations;

196. For a temporary, preliminary, and permanent injunction prohibiting any development of the OWEF Project on the Class L lands that are the subject of this action;

197. For a temporary, preliminary, and permanent injunction prohibiting any development of the OWEF Project on the lands subject to a Class II or III Visual Resources Management designation;

198. Alternatively, for a temporary, preliminary, and permanent injunction prohibiting any implementation of the OWEF Project of any kind, including any ground-disturbing activities, or any issuance of Notices to Proceed, until Interior completes a valid analysis of direct, indirect, and cumulative impacts pursuant to NEPA;

199. Alternatively, for a temporary, preliminary, and permanent injunction prohibiting any implementation of the OWEF Project of any kind, including any ground-disturbing activities, or any issuance of Notices to Proceed, until Interior completes a Programmatic EIS on the impacts of Interior's concerted and systemic program of renewable energy development in the California desert;

200. Alternatively, for a temporary, preliminary, and permanent injunction prohibiting any implementation of the OWEF Project of any kind, including any ground-disturbing activities, or any issuance of Notices to Proceed, until Interior completes the Section 106 process pursuant to NHPA, including its government-to-government consultation duties;

201. For costs of suit, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

202. For such other injunctive, equitable, and other relief as the Court may deem just and proper to provide complete relief to the Tribe.

DATED this 14th day of May, 2012.

MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

s/*Thane D. Somerville*

Thane D. Somerville
Frank R. Jozwiak
Attorneys for the Quechan Tribe
of the Fort Yuma Indian Reservation
801 Second Avenue, Suite 1115
Seattle, WA 98104-1909
t.somerville@msaj.com
f.jozwiak@msaj.com
Tel: 206-386-5200
Fax: 206-386-7322

T:\WPDOCS\0267\10126\Pleadings\Complaint_051412 FILE.doc
kfn:5/14/12

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Quechan Tribe of the Fort Yuma Indian Reservation

**(b)** County of Residence of First Listed Plaintiff: Imperial
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Thane D. Somerville, Frank R. Jozwiak
Morisset, Schlosser, Jozwiak & Somerville
801 2nd Ave., Ste. 1115, Seattle, WA 98104 Tel: 206-386-5200

**DEFENDANTS**
U.S. Department of the Interior; U.S. Bureau of Land Management; et al.

County of Residence of First Listed Defendant: ______
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)
'12CV1167 WQHMDD

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☒ 1 U.S. Government Plaintiff (XXXXXXXXX)
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant (skh)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☒ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
5 U.S.C. 551, et seq.; 43 U.S.C. 4332, et seq.; 16 U.S.C. 470, et seq.; 43 U.S.C. 1701 et seq.; 28 U.S.C. 2201
Brief description of cause:
Request for injunctive relief; violation of APA, NEPA, FLPMA

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☑ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE: HON. LARRY ALAN BURNS
DOCKET NUMBER: 10CV2241 LAB CAB

DATE: May 14, 2012
SIGNATURE OF ATTORNEY OF RECORD: s/Thane D. Somerville

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______