1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11   QUECHAN TRIBE OF THE FORT YUMA           CASE NO. 12cv1167-GPC(PCL)
     INDIAN RESERVATION,
12
                              Plaintiff,      **ORDER DENYING PLAINTIFF'S**
13                                            **MOTION FOR SUMMARY**
                                              **JUDGMENT; GRANTING**
14          vs.                               **FEDERAL DEFENDANTS'**
                                              **MOTION FOR SUMMARY**
15                                            **JUDGMENT; GRANTING**
                                              **DEFENDANT-INTERVENOR**
16                                            **OCOTILLO'S MOTION TO**
     UNITED STATES DEPARTMENT OF THE          **DISMISS AND FOR SUMMARY**
17   INTERIOR, et al.,                        **JUDGMENT**

18                           Federal Defendants,
                                              [Dkt. Nos. 80, 111, 115.]
19
     OCOTILLO EXPRESS LLC,
20
                   Defendant-Intervenor.
21

22

23          On May 14, 2012, Plaintiff filed a complaint against Federal Defendants challenging the United

24   States Department of the Interior's approval of the May 11, 2012 Record of Decision ("ROD")

25   approving the Ocotillo Wind Energy Facility Project ("OWEF" or "Project"), a utility-scale wind

26   power project in the Sonoran Desert in Imperial County, California.  (Dkt. No. 1.)  On August 31,

27   2012, Plaintiff filed a first amended complaint which added causes of action concerning events

28   subsequent to the Record of Decision ("ROD").  (Dkt. No. 70.)  On September 24, 2012, Plaintiff filed

a motion for summary judgment.  (Dkt. No. 80.)  On December 10, 2012, Federal Defendants and Defendant-Intervenor Ocotillo Express filed an opposition and their cross-motions for summary judgment.  (Dkt. Nos. 111, 115.)  On December 24, 2012, Plaintiff filed a reply to its motion for summary judgment and opposition to Federal Defendants' cross-motion for summary judgment. (Dkt. No. 118.)  Plaintiff also filed a reply in support of its motion for summary judgment and opposition to Ocotillo's cross-motion for summary judgment.  (Dkt. No. 120.)  On January 2, 2013, Ocotillo and Federal Defendants filed a reply to their cross-motions for summary judgment.[1]  (Dkt. Nos. 123, 124.)

A hearing on the cross motions for summary judgment was held on January 18, 2013.  (Dkt. No. 126.)  Thane Somerville, Esq. appeared on behalf of Plaintiff; Marissa Piropato, Esq. appeared on behalf of Federal Defendants; and Svend Brandt-Erichsen, Esq. and Nicholas Yost, Esq. appeared on behalf of Ocotillo.  (Id.)  After a thorough review of the administrative record, the applicable law, the parties' briefs, and hearing oral argument, the Court DENIES Plaintiff's motion for summary judgment; GRANTS Federal Defendants' motion for summary judgment; and GRANTS Defendant-Intervenor's motion to dismiss and for summary judgment.

**Summary**

Plaintiff brought suit alleging violations of the National Historic Preservation Act, ("NHPA"), Federal Land Policy and Management Policy Act, ("FLPMA"), National Environmental Policy Act, ("NEPA"), Archaeological Resources Protection Act, ("ARPA"), and Native American Graves Protection and Repatriation Act, ("NAGPRA"), under the Administrative Procedures Act ("APA").  Quechan challenges BLM's approval of the ROD allowing the construction of 112 wind turbines in an area that contains cultural and biological significance to the Tribe.

The Court's role in an APA case is to determine whether the BLM's approval of the ROD and grant of the ROW was arbitrary, capricious or an abuse of discretion."  5 U.S.C. § 706(2)(A).  This is a highly deferential standard where the agency's action is presumed to be valid as long as there is a reasonable basis for its decision.  Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007).

---

[1]The arguments in Federal Defendants and Defendant-Intervenor Ocotillo Express' briefs are similar.  Therefore, for purposes of these motions, the Court will collectively refer to their arguments as the "Defendants."

Under NHPA, Plaintiff complains about its lack of involvement in the archaeological survey and the Section 106 consultation due to BLM.  However, the administrative record reveals many attempts, starting regularly in 2010, were made by BLM to engage the Tribe in Section 106 government to government consultation.  Plaintiff did not accept these repeated request until December 2011, towards the end of the approval process.  Moreover, during the archeological survey, a survey crew went out daily with Native American consultants.  Plaintiff has not shown that they were excluded from access to the "direct impact" survey areas.

Although Plaintiff alleges that BLM did not properly identify all historic properties, the record reveals that BLM hired an archaeological consultant and it began conducting an archaeological survey in September 2010, with a draft Survey issued in May 2011, and a final report issued in March 2012. The identification efforts were significant.

As to FLPMA, Plaintiff's argument that the Project for 112 wind turbines does not comply with the Class L designation and violates the VRM standard and will result in the unnecessary and undue degradation of the public lands is based on a narrow reading of the CDCA Plan and the caselaw. Numerous mitigation measures are mandated in the ROD to protect different resource values in order to comply with FLPMA and the CDCA Plan.

Under NEPA, the BLM stopped, looked and listened when it took a "hard look" at the cumulative effects of the Project with past, present and future projects; considered indirect growth-inducing effects of the Project; and did not have to analyze its "priority" renewable projects in the entire CDCA in a single Environmental Impact Statement ("EIS").

Moreover, BLM consulted and coordinated with other federal and state agencies and addressed compliance with federal and state standards.  The State of California determined that there were no inconsistencies between the Project and state or local law.  While the BLM admits there will be unavoidable adverse impacts on different resource values, numerous mitigation efforts were implemented to limit the impact of the Project and to be in compliance with federal, state and local laws.

Based on a careful review of the administrative record and the parties' briefs, the BLM's decision to approve the ROD was reasonable as it considered all relevant factors and provided an

1   analysis that presented a rational connection between the facts found and the conclusions it made based

2   on relevant law.  Therefore, the Court concludes that the BLM's decision to approve the ROD was not

3   arbitrary, capricious or an abuse of discretion.

4                                    **Procedural Background**

5            On May 14, 2012, Plaintiff Quechan Tribe of the Fort Yuma Indian Reservation, a federally

6   recognized Indian Tribe, filed a complaint against Defendants United States Department of the

7   Interior; United States Bureau of Land Management ("BLM"); Ken Salazar, Secretary of the Interior;

8   Robert Abbey, Director, Bureau of Land Management; Teri Raml, District Manager, BLM California

9   Desert District; and Margaret Goodro, Field Manager, BLM El Centro Field Office (collectively

10  referred to as "Federal Defendants").  (Dkt. No. 1.)

11           On May 15, 2012, the Court granted Ocotillo Express LLC's ("Ocotillo") motion to intervene.

12  (Dkt. No. 25.)  On May 22, 2012, the Court denied without prejudice Plaintiff's *ex parte* motion for

13  temporary restraining order and order to show cause why preliminary injunction should not issue.

14  (Dkt. No. 48.)  On August 31, 2012, Plaintiff filed a first amended complaint which added causes of

15  action concerning events subsequent to the Record of Decision ("ROD").  (Dkt. No. 70.)  In the first

16  amended complaint, Plaintiff alleges violations under the Federal Land Policy and Management Act

17  ("FLPMA"); National Environmental Policy Act ("NEPA"); National Historic Preservation Act

18  ("NHPA"); Archaeological Resources Protection Act ("ARPA"); Native American Graves Protection

19  and Repatriation Act ("NAGPRA"); Administrative Procedures Act ("APA"); applicable Interior

20  regulations; and the California Desert Conservation Area ("CDCA") Plan based on BLM's approval,

21  execution and implementation of the Project.  (Id.)

22           On September 7, 2012, Federal Defendants filed a notice of filing a copy of the administrative

23  record. (Dkt. No. 73.)  On September 13, 2012, Federal Defendants filed under seal a DVD containing

24  a portion of the administrative record.  (Dkt. No. 77.)  On October 4, 2012, Federal Defendants filed

25  a hyperlinked administrative record index and a supplemental administrative record index reflecting

26  eight documents that were inadvertently included in the privilege log as part of the initial

27  administrative record filed on September 7, 2012.  (Dkt. No. 84.)

28           On September 19, 2012, Ocotillo filed a motion to supplement the administrative record.  (Dkt.

No. 78.)  On September 24, 2012, Plaintiff filed a motion for summary judgment.  (Dkt. No. 80.)  Concurrently, Plaintiff filed a request for judicial notice, or in the alternative, a motion to supplement the administrative record.  (Dkt. No. 82.)  On October 4, 2012, the case was transferred to the undersigned judge.  (Dkt. No. 85.)

On November 14, 2012, the Court denied Ocotillo's motion to supplement the record.  (Dkt. No. 104.)   On November 15, 2012, the Court denied Plaintiff's motion to supplement the administrative record.  (Dkt. No. 105.)

On November 26, 2012, Federal Defendants filed a DVD of the post-ROD implementation record.  (Dkt. No. 106.)  On November 29, 2012, Federal Defendants filed a DVD of the post-ROD implementation administrative record under seal.  (Dkt. No. 109.)

On December 10, 2012, Federal Defendants and Defendant-Intervenor Ocotillo Express filed an opposition and their cross-motions for summary judgment.  (Dkt. Nos. 111, 115.)  On December 24, 2012, Plaintiff filed a reply to its motion for summary judgment and opposition to Federal Defendants and Ocotillo's cross-motions for summary judgment.  (Dkt. Nos. 118, 120.)  On January 2, 2013, Ocotillo and Federal Defendants filed a reply to their cross-motions for summary judgment.  (Dkt. Nos. 123, 124.)

**Factual Background**

On December 19, 1980, the Department of the Interior ("Interior") approved a Record of Decision ("ROD") for the California Desert Conservation Area ("CDCA") which established a "long-range, comprehensive plan for the management, use, development, and protection of over 12 million acres of public land . . . ."  (OWEF[2] 5914.)  On October 9, 2009, Ocotillo applied to the Bureau of Land Management ("BLM") and to the County of Imperial to construct and operate a wind energy facility on public land within the CDCA.  (OWEF 5261.)  In February 2012, the Department of the Interior created a Proposed Plan Amendment & Final Environmental Impact Statement/Final Environmental Impact Report for the Ocotillo Wind Energy Facility analyzing the impact of a 12,484 acre right-of-way over public land in favor of Ocotillo to build 155 wind turbine generators ("Final EIS").  (OWEF 804, 825.)  On May 11, 2012, Interior approved a Record of Decision for the Ocotillo

---

[2]OWEF refers to the Administrative Record filed with the Court.

[12cv1167-GPC(PCL)]

Wind Energy Facility and Amendment to the California Desert Conservation Area Plan ("ROD") which approves a 10,151 acre right-of-way over public land in favor of Ocotillo to build 112 wind turbine generators. (OWEF 109.) On May 8, 2012, a Memorandum of Agreement ("MOU") was entered into by the California State Historic Preservation Historic Office, the Advisory Council on Historic Preservation, the BLM, the Army Corps of Engineers and Ocotillo Express as part of the ROD in order to mitigate and minimize adverse impacts of the OWEF project on cultural resources. (OWEF 222.)

**Discussion**

**A.     Standard of Review**

The Administrative Procedures Act ("APA") governs judicial review of agency actions under NHPA, FLMPA, and NEPA. See 5 U.S.C. § 706; see also Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 778 (9th Cir. 2006) (NEPA and NHPA); Oregon Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1124 (9th Cir. 2007) (FLPMA and NEPA). An agency's decision must be upheld under judicial review unless the court finds that the decision or action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Actions that are approved "without observance of procedure required by law" are also subject to be set aside upon judicial review. 5 U.S.C. § 706(2)(D).

The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). Agency action is valid if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations omitted); see also Nat'l Wildlife Fed v. U.S. Army, 384 F.3d 1163, 1170 (9th Cir. 2004) (an agency must present a "rational connection between the facts found and the conclusions made."). The burden is on Plaintiff to show any decision or action was arbitrary and capricious. See Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

/ / / /

/ / / /

[12cv1167-GPC(PCL)]

**B.      National Historic Preservation Act ("NHPA")**

Under the NHPA, Plaintiff presents two arguments.[3]  First, Plaintiff argues that the BLM failed to adequately identify all historic properties prior to approval.  Second, it contends that the BLM failed to adequately consult the Tribe prior to the Project's approval.

"Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs."  Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 805 (9th Cir. 1999).

> Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c).  The Forest Service must confer with the State Historic Preservation Officer ("SHPO") and seek the approval of the Advisory Council on Historic Preservation ("Council").

Id.

**1.      Identify All Historic Properties Prior to Approval**

Under the regulations implementing NHPA, the agency must identify the historic properties within the affected area.  36 C.F.R. § 800.4.  The regulations specify that a "reasonable and good faith effort . . . may include background research, consultation, oral history interviews, sample field investigation, and field survey."  36 C.F.R. § 800.4(b)(1).

Plaintiff appears to argue that delineation of the project site was arbitrarily changed during the archaeological survey in order to accommodate the Project so that the survey area where the wind turbines would be built were excluded from analysis in the "direct impact" areas and were considered "indirect impact" areas.  (OWEF 24776-777.)  Defendants argue that they conducted robust identification efforts  along with significant mitigation measures.

After the Project's archaeological consultant, Tierra Environmental Services, Inc. ("Tierra"),

---

[3]Plaintiff also argues that cremation sites were not adequately surveyed as cremation sites continue to be discovered and that dozens of new cultural sites and hundreds of artifacts have been identified within the direct impact areas since Project approval.  These arguments are based on post-ROD records that are not properly before this Court under the APA.  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) (Generally, judicial review of an agency action is limited to a review of the administrative record in existence at the time of the agency's decision.)

surveyed the Project area, it released a draft Preliminary Historical Resources Reconnaissance Survey/Evaluation in May 2011. (OWEF 39822-848.) Subsequently, the final report entitled "Historical Resources Evaluation and Impact Analysis for the Ocotillo Express Wind Energy Project Imperial County, California" was issued. (OWEF 39822.)

In a report entitled "Final Class II & III Inventory Research Design and Work Plan for the Ocotillo Express Wind Energy Project," dated August 2, 2010, Tierra explained that it had been commissioned to conduct a BLM Class III intensive heritage resources survey of the 8,000-acre direct impact Area of Potential Effect ("APE") and a Class II sample survey of 20 percent, or 1,400 acres, of the 7,000-acre indirect impact APE. (OWEF 38959; 38985.) "The primary goal of the survey was to identify and thoroughly document all significant prehistoric and historic resources in the project area and to discuss these resources in terms of regional research issues." (OWEF 38959.) The survey work focused on areas of direct impact and surrounding buffer areas. (OWEF 38959.)

The report explains that

> [o]f those 15,000 acres, approximately 8,000 acres are anticipated by the BLM to be subject to direct impacts of the construction and operation of the turbines. This is referred to as the "direct impact APE". The remaining 7,000 acres are anticipated to receive indirect impacts, referred to as the "indirect impact APE". The direct impact APE includes all areas where ground-disturbing activities may take place, plus a 500-foot buffer.

(OWEF 38959; see also OWEF 38985.)

The final EIS also provides that

> The direct impact APE includes all areas where ground-disturbing activities may take place, including turbine locations, transmission corridors, staging areas, access roads, and other supporting infrastructure and improvements, along with a 500-foot buffer surrounding all facilities.

(OWEF 929.)

Contrary to Plaintiff's assertions, the direct impact areas included areas where the wind turbines would be constructed. Therefore, Plaintiff's argument is without merit.

Second, Plaintiff contends that tribal monitors were not allowed to survey areas identified as "direct impact" areas. It argues that when tribal representatives were finally allowed access in late April 2012, they found and notified BLM of new/unrecorded sites and isolates. Defendants argue that tribal representatives participated in the archaeological resource survey.

Beginning in September 2010, Tierra conducted an intensive archeological survey for the direct impact area and a representative portion of the area of indirect impacts. (OWEF 949.) In March 2012, Tierra issued an Archaeological Survey Report ("Report") on the Project. (SEALED OWEF 59166.) According to the report, Native American monitors were present during the entire survey effort. (SEALED OWEF 59217, 59219, 59349-470.) Archaeological fieldwork began on September 27, 2010 and each day, a survey crew which consisted of a field director or crew chief plus one to three field archaeologists and Native American consultants went into the Project areas. (SEALED OWEF 59217.)  The Report contains a section entitled "Native American Participation in Archaeological Survey which shows that regional tribes were invited to participate in the field surveys and provides detailed information about the communication and involvement by the different tribes. (SEALED OWEF 59440-447.) Appendix C lists in detail which tribal monitors participated in the survey for each day from September 28, 2010 to August 27, 2011. (SEALED OWEF 59440-447.)  According to the Report, at least one tribal representative went out each day on these surveys. (SEALED OWEF 59440-447.)  Appendix C also provides a telephone log of contacts by Tierra with each tribal representative. (SEALED OWEF 59448-456.)

At BLM's direction, the archaeological survey effort was also monitored by a third-party, Environmental Science Associates ("ESA"), which sent trained archeologists to observe the field work and Tierra's compliance with the work plan approved by BLM. (SEALED OWEF 58443-55.)  The monitoring occurred periodically between September 2010 and July 2011. (SEALED OWEF 58446.) The report states that "Native American representatives were observed to be present on an intermittent basis and circulated amongst the crews.  Native American participants were observed on occasion to provide input on the importance of resources encounters." (SEALED OWEF 58448.)

Besides a letter Quechan wrote complaining that tribal monitors were forbidden to survey the direct impact areas, Plaintiff has failed to show that tribal monitors were not allowed to survey the "direct impact" areas.  The administrative record shows that tribal monitors were invited and

1    participated in the survey areas.  Accordingly, Plaintiff's arguments fail.[4]

2         **2.    Section 106 Consultation with Tribe**

3         The NHPA implementing regulations require the BLM, at all stages of the section 106 process,

4    to consult with tribes that "attach[ ] religious and cultural significance to historic properties that may

5    be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii).  "The goal of consultation[5] is to identify

6    historic properties potentially affected by the undertaking . . . ." Id. § 800.1.  The regulations require

7    agencies to provide the tribe with "a reasonable opportunity to identify its concerns about historic

8    properties, advise on the identification and evaluation of historic properties, including those of

9    traditional religious and cultural importance, articulate its views on the undertaking's effects on such

10   properties, and participate in the resolution of adverse effects." Id. § 800.2(c)(2)(ii)(A).  Further,

11   "[c]onsultation [with Indian tribes] should commence early in the planning process, in order to identify

12   and discuss relevant preservation issues," id., and consultation with a tribe "must recognize the

13   government-to-government relationship between the Federal Government and Indian tribes." Id. §

14   800.2(c)(2)(ii)(C).  The regulation also provides that the "agency official shall consult with

15   representatives designated or identified by the tribal government . . . ." Id. § 800.2(c)(ii)(C).  "The

16   agency official may be a State, local or tribal government official who has been delegated legal

17   responsibility for compliance with section 106 in accordance with Federal Law." Id. § 800.2(a).

18        Plaintiff argues that the BLM failed to adequately consult with the Tribe prior to approval of

19   the Project.  It asserts that the first government to government consultation did not occur until late in

20   the process on January 31, 2012, a little over three months prior to approval.  In opposition,

21   Defendants argue that consultation began early in the planning process.

22        Starting in 2007 and again in 2010, BLM attempted to initiate formal government to

23   _____

24   [4]Plaintiff further argues that despite repeated requests, the BLM did not conduct prehistoric trials or ethnography studies prior to approving the undertaking and was informed that BLM is allowing the applicant to fund the study after the Project is built.  This issue is only addressed in

25   Plaintiff's motion for summary judgment and not addressed in Defendants' reply or Plaintiff's reply. The Court declines to address this issue as Plaintiff has not provided sufficient legal authority to

26   support its argument.

27

28   [5]Consultation is "the process of identifying and seeking input from appropriate tribal governing bodies, considering their issues and concerns, and documenting the manner in which the input affected the specific management decision(s) at issue."  (BLM Manual 8120, Glossary of Terms.)

[12cv1167-GPC(PCL)]

government consultation in the early stages of planning for wind testing and monitoring.  (OWEF 28389.)  On February 4, 2010, the Acting Field Manager[6] of BLM wrote a letter to Quechan's President to inform Quechan about Ocotillo's ROW application to conduct wind testing and to develop a wind energy project.  (OWEF 30353; 1647.)  The letter invited Quechan to engage in government to government consultation pursuant to section 106 and other laws.  (OWEF 30353; 1647.)  The letter also requested assistance in identifying issues concerning sacred sites and places of religious and cultural significance that might by affected by the Project.  (OWEF 30353.)

In a letter dated July 28, 2010, BLM provided Quechan's President with an update on the Project and extended an invitation to Quechan to engage in government to government consultation. (OWEF 30319.)  On March 9, 2011, BLM sent another letter to Quechan's President inviting it to engage in government to government consultation.  (OWEF 30224.)  The letter requested it be placed on the agenda of the Tribal Council's regular meeting and reiterated what it asked in January 2011, that Quechan inform them who would serve as the authorized representative for the Tribe as to government to government consultation.  (OWEF 30224-31.)

On April 6, 2011, BLM El Centro Field Office management team met with the Tribal Council. (OWEF 29524.)  At that meeting, the Tribal Council agreed to monthly consultative meetings; however BLM noted, in a letter dated January 10, 2012, that it had not yet been successful in being added to the Tribal Council's agenda.  (OWEF 29524.)

In a letter dated April 8, 2011, the BLM informed and updated Quechan about the Project and repeated the importance of government to government consultation. (OWEF 30196.)  The letter set up a field trip meeting with Tierra to inform Quechan about the Project, any updates and to discuss the preliminary archaeological survey conducted by Tierra.  (OWEF 30196.)  In an August 11, 2011 letter to Quechan, BLM informed and updated Quechan about the Project and requested government to government consultation.  (OWEF 30122.)  In that letter, BLM requested assistance in defining resources, their significant value, and whether values may be impacted by the Project.  (OWEF 30122.) Another letter was sent on September 14, 2011.  (OWEF 30080.)  In an October 5, 2011 letter, BLM

---

[6]Field Managers and State Directors can conduct government to government meetings with Tribes.  (BLM Manual 8120.06.)

[12cv1167-GPC(PCL)]

sent a CD containing the draft Archaeological Survey Report.  (OWEF 30047.)  On November 23, 2011, BLM wrote to the President of Quechan to inform him about the Project and to invite the Tribe to government to government consultation.  (OWEF 29688.)  During this time period from June 2011 to December 16, 2011, BLM also sent emails to tribal officials requesting government to government meetings.  (OWEF 29625-631; 28293-94.)  Despite the repeated requests, the Tribal Council did not meet with BLM until January 31, 2012.  (OWEF 28101.)

In a letter dated January 12, 2012, BLM wrote to a Council Member who was also the Liaison to the Quechan Culture Committee.  (OWEF 29524.)  The purpose of the letter was to engage Quechan in government to government consultation.  (OWEF 29524.)  It discussed the efforts BLM has made to establish government to government consultation, discussed the importance of these consultations, provided numerous ways that Quechan could contact BLM's Field Manager through email and telephone, and also provided the Associate Manager's contact information as an alternate method to contact BLM.  (OWEF 29524-26.)  On January 24, 2012, Quechan agreed to meet with representatives of BLM on January 31, 2012.  (OWEF 28101.)

BLM and the Tribal Council held government to government consultation on January 31, 2012, February 22, 2012, March 21, 2012, and April 18, 2012.  (OWEF 29430, 29458, 29164, 29117.)  During this time, there were also group meetings with SHPO, ACHP, the Tribes and Pattern Energy to continue discussions on treatment or other measures to avoid, minimize or resolve impacts.  (OWEF 29480.)

After the January 31, 2012 meeting, BLM continued to write letters to Quechan, on January 27, 2012 and February 27, 2012, to provide information and updates about the project.  (OWEF 29480; 29357.)  The February 27 letter invited the Tribe to a specific section 106 meeting to include other tribes, to discuss the Project and the revised draft MOA.  (OWEF 29360.)  It explained that the meeting would discusses the changes to the MOA and give the Tribe an opportunity to provide input, ask questions or provide comments.  (OWEF 29360.)  It appears that Plaintiff's involvement in the process began in earnest starting in December 2011.  (OWEF 28354-55; 26379, 26381.)

In support of its argument, Plaintiff cites to a case in this district where the Court granted Plaintiff's motion for preliminary injunction because Plaintiff had demonstrated a likelihood of success

[12cv1167-GPC(PCL)]

on the merits as to Defendants' failure to comply with the Section 106 consultation with the Tribe under NHPA.  Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. of Interior, 755 F. Supp. 2d 1104 (S.D. Cal. 2010).  In that case, the defendant approved a solar energy project that would install about 30,000 "suncatcher" solar collectors.  Id. at 1106.  A letter from the tribe to BLM's Field Manager suggested that the Tribe was consulted late in the planning process, that the time frame for consultation was compressed and it expressed concerned about the lack of consultation.  Id. at 1111. The tribe contacted BLM early in the process on February 19, 2008 and put BLM on notice regarding the important historical and cultural sites within the Project area and asked BLM to provide a survey of the area and to meet with the tribe's government.  Id. at 1118.  Despite BLM's indication that it would be glad to meet with the tribe and repeated requests by the tribe, BLM did not meet with the tribe's government until October 16, 2010.  Id.  Although BLM engaged in some communication and consultation, the Court concluded they were cursory, inadequate and mostly informational meetings where the Tribe's opinions were not sought and were not government to government consultation.  Id. "[P]ublic informational meetings, consultation with individual tribal members, meetings with government staff or contracted investigators and written updates" do not amount to "government to government" consultation contemplated by the regulations.  Id. at 1119.  The Court noted that the tribe's request for information and meetings were rebuffed or extremely delayed as BLM imposed deadlines that loomed or passed.  Id,

In this case, the administrative record shows that the opposite occurred compared to the facts in Quechan, 755 F. Supp. 2d at 1104.  Here, BLM made numerous attempts starting in 2010 and then in 2011 to engage in government to government consultation.  Quechan did not accept the BLM's repeated requests to engage in government to government consultation until December 2011. Moreover, no request for meetings by the Tribe was made or initiated until December 2011.  Once the first meeting was held on January 31, 2012, subsequent monthly meetings were held between BLM and the Tribal Council.  (OWEF 29430, 29458, 29164, 29117.)  Therefore, the Court concludes that the BLM did not fail to adequately conduct Section 106 consultations.

In addition Plaintiff argues that it was deprived of timely information necessary to the consultation process.  As indicated above, despite Plaintiff's lack of action concerning government to

1  government consultation, the BLM regularly sent letters and attached documents to inform Quechan

2  of any progress in the Project.

3       Based on the administrative record, Plaintiff has failed to demonstrate that BLM failed to

4  conduct Section 106 government to government consultation with Quechan.  Accordingly, the BLM's

5  decision was not arbitrary, capricious or an abuse of discretion.  See 5 U.S.C. § 706.

6  **C.**     **Federal Land Policy Management Act ("FLPMA")**

7       Under the FLPMA, Plaintiff presents three arguments.  First, it contends that Federal

8  Defendants violated FLPMA and the CDCA plan by approving the OWEF project because it will

9  "significantly diminish" and "degrade" sensitive resource values on Class L lands.  Second, Quechan

10 maintains that the Project violates the visual resource management ("VRM") standards.  Third, Plaintiff

11 asserts that the Project will result in the unnecessary and undue degradation of the public lands.

12     **1.**     **Significantly Diminish and Degrade Sensitive Resource Values on Class L Lands**

13     The Federal Land Policy and Management Act of 1976 ("FLPMA"), codified at 43 U.S.C. §

14 1701 et seq., governs the BLM's management and land use planning of federal public lands.  43 U.S.C.

15 § 1701(a).  The FLPMA provides that the management of public lands be based on "multiple use and

16 sustained yield."  43 U.S.C. §§ 1701(7); 1732.  Multiple use is defined as "the management of public

17 lands and their various resource values so that they are utilized in the combination that will best meet

18 the present and future needs of the American people . . . a combination of balanced and diverse resource

19 uses that takes into account the long-term needs of future generations for renewable and nonrenewable

20 resources . . . ."  43 U.S.C. § 1702(c).  Sustained yield is defined as achieving and maintaining "in

21 perpetuity of a high-level annual or regular periodic output of the various renewable resources of the

22 public lands consistent with multiple use."  43 U.S.C. § 1702(h).

23     Within FLPMA, Congress also established the California Desert Conservation Area ("CDCA")

24 to "provide for the immediate and future protection and administration of the public lands in the

25 California desert within the framework of a program of multiple use and sustained yield, and the

26 maintenance of environmental quality."  43 U.S.C. § 1781(b).  The 25 million acre CDCA includes

27 over 12 million acres of public lands.  (OWEF 5914.)  Pursuant to the direction provided in the

28 FLPMA, in 1980, the BLM developed the California Desert Conservation Area Plan ("CDCA Plan")

1  to manage the public lands within the CDCA.  43 U.S.C. § 1781(d); (see also OWEF 5905).  As part

2  of the CDCA Plan, Congress directed the Interior to take "into account the principles of multiple use

3  and sustained yield in providing for resource use and development, including, but not limited to,

4  maintenance of environmental quality, rights-of-way, and mineral development." 43 U.S.C. § 1781(d).

5      The CDCA Plan divides lands in the CDCA under BLM management into four multiple-use

6  classes.  (OWEF 5920.)  The classes are: Multiple-Use Class ("MUC") C (controlled use), Multiple-

7  Use Class L (limited use); Multiple-Use Class M (moderate use); and Multiple-Use Class I (intensive

8  use).  (Id.; OWEF 5928.)  It is undisputed that OWEF is situated on Multiple Use Class L lands.

9      Class L "protects sensitive, natural, scenic, ecological, and cultural resource values.  Public

10  lands designated as Class L are managed to provide for generally lower-intensity, carefully controlled

11  multiple use of resources, while ensuring that sensitive values are not significantly diminished."

12  (OWEF 5920.)  Under the Plan Elements[7], Class L is where "judgement is called for in allowing

13  consumptive uses only up to the point that sensitive natural and cultural values might be degraded."

14  (OWEF 5928.)  Under the multiple-use guidelines, Class L lands allows for wind/solar use "after NEPA

15  requirements are met."  (OWEF 5922.)

16      While Plaintiff does not dispute that the Class L designation does not prohibit all wind and solar

17  energy development, it argues that wind and solar development are permissible only if they are

18  consistent with the substantive limits of the CDCA Plan and Class L designation which require that the

19  proposed project does not "significantly diminish" or "degrade" the sensitive resource values.  It

20  contends that the Project, as approved, will significantly diminish or degrade the resource values as

21  noted in the final EIS.  (OWEF 832-40.)  Defendants assert that the CDCA Plan allows for wind energy

22  development and numerous mitigation plans were implemented to lessen and/or avoid impacts to

23  resources so as not to significantly diminish or degrade the resource values.  They dispute Plaintiff's

24  characterization that "unavoidable adverse impacts" found in the final EIS amount to "significantly

25  diminished" as contemplated under the MUC L designation.

26      The ROD for the CDCA Plan contemplates wind, solar and geothermal power plants and

27

28      [7]The Plan Elements provide "more specific application, or interpretation, of multiple-use class guidelines for a given resource and its associated activities."  (OWEF 5928.)

recognizes that "[p]ower plants of any kind may be incompatible with Class L.  However, the recommended decision provides that the guidelines be kept as to allow the power plants if environmentally acceptable.  Appropriate environmental safeguards can be applied to individual project proposals which clearly must be situated where the particular energy resource are favorable." (OWEF 5759.)[8]   Under the Plan Element of Energy Production and Utility Corridors, it states that one of its goals is to [i]dentify potential sites for geothermal development, wind energy parks, and powerplants." (OWEF 6000.)   The Plan Element also states that "[s]ites associated with power generation or transmission not identified in the Plan will be considered through the Plan Amendment process." (OWEF 6002.) The CDCA Plan recognized and expected that new energy technology would develop in the future which would include solar and wind energy programs.  (OWEF 6002.)

The final EIS notes that even after implementation of all mitigation measures, there would be "unavoidable adverse impacts" on air quality, cultural resources, noise, vegetation resources, visual resources, wildlife resources and paleontological resources. (OWEF 832-40.) However, the report does not conclude that the project will "significantly diminish" or "degrade" the sensitive resource values. Plaintiff does not demonstrate that "unavoidable adverse impacts" equates to "significantly diminish."

The FLPMA and the CDCA require a careful balancing between multiple use and sustained yield management planning with protecting the quality of "historical, scenic archaeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." See 43 U.S.C. § 1781.  The ROD for the Project states that the BLM conducted a careful balancing of the importance of the OWEF to help California achieve its renewable portfolio standard and green house gas reduction objectives and to implement the Energy Policy Act against the importance of preserving the environmental and cultural resources found on those lands that would affected. (OWEF 109-110.) While the ROD recognizes that the Project "will still adversely affect cultural resources that are important to a number of the Indian tribes", such adverse affects were reduced by mitigation measures. (OWEF 126-27.)  For example the number of proposed turbines were reduced from 155 to 112 after

---

[8] The parties dispute whether the CDCA Plan would allow fossil-fuel and nuclear powerplants on Class L lands.  The Plan is not clear.  In the Energy Production and Utility Corridors Element, it states "[a] Plan Amendment will be required for fossil-fuel and nuclear powerplants proposed in a Class L area."  (OWEF 6002.)  However, the Multiple-Use Class Guidelines table shows that nuclear and fossil fuel facilities are not allowed on Class L lands.  (OWEF 5922.)

1    consultation with the tribes regarding the spiritual and cultural concerns.  (OWEF 111.)  It also

2    determined that the public lands outside of the Refined Project footprint are unsuitable for wind energy

3    development.  (OWEF 111.)  The final EIS states that the Mitigation Monitoring Program will "avoid

4    or substantially reduce adverse impacts."  (OWEF 832.)  The ROD established numerous mitigation

5    measures to limit the impact of the project.  (OWEF 421-455; <u>see also</u> OWEF 264-85 (Historic

6    Property Treatment); 308-19 (Buried Sites Sensitivity Model and Buried Sites Testing Plan); 20498-530

7    (Burrowing Owl Migration and Monitoring Plan); 681-720 (Habitat Revegetation Plan); 723-799

8    (Golden Eagle Conservation Plan); 326-338 (NAGPRA Plan of Action); 376-416 (Environmental and

9    Construction Compliance Monitoring Plan)).  Moreover, as the Defendants point out, the total area

10   estimated for disturbance is about 574 acres which is 4.5% of the total ROW and the permanent Project

11   footprint after construction will be about 116.5 acres which is slightly more than .9% of the total ROW.

12   (OWEF 590.)  Class L land encompasses 5,883,000 acres.  (OWEF 5920.)

13         Based on a review of the administrative record, the Court concludes that the BLM did not act

14   arbitrarily, capriciously or abused its discretion in allowing the Project on Class L lands.  <u>See</u> 5 U.S.C.

15   § 706(2)(A).

16         **2.      Visual Resource Management ("VRM")**

17         The FLPMA identifies visual resources as one of the many resources for which public lands

18   should be managed. 43 U.S.C. §§ 1701(a)(8); 1702(c); 1781(a)(1).  Under Multiple Use Class L, scenic

19   values are not to be "significantly diminished."  (OWEF 5920.)  The FLMPA directs the BLM to

20   inventory all public lands and their resource and other values, which includes scenic values. 43 U.S.C.

21   § 1711.  However, such inventory "shall not, of itself, change or prevent change of the management or

22   use of public lands."  <u>Id.</u>

23         The VRM policy is laid out in the BLM Manual.  (<u>See</u> OWEF 5723-39; 5669-92; 5693-5722.)

24   The BLM inventories and manages the visual values through the VRM policy which involves a three-

25   step process.  (OWEF 1086, 5727-28.)  The visual resource management classes are defined as

26   "categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. There

27   are four classes.  Each class has an objective which prescribes the amount of change allowed in the

28   characteristic landscape."  (OWEF 5735.)

The first step in the VRM process is to determine an area's visual values by conducting a Visual Resource Inventory ("VRI").  (OWEF 5678-79.)  VRI is "an inventory tool that portrays the relative value of the visual resources."  (OWEF 5677.)   BLM assigns a VRI Class from VRI Class I (highest visual value generally assigned to wilderness areas) to VRI Class IV (lowest visual value).  (OWEF 5678.)  VRI classes are "informational in nature and provide the basis for considering visual values in the resource management plan ("RMP") process."  (OWEF 5678.)  "They do not establish management direction and should not be used as a basis for constraining or limiting surface disturbing activities."  (OWEF 5678.)

The second step is to establish VRM classes for particular areas of public lands usually through the Resource Management Plan[9] ("RMP") process.  (OWEF 5678; 5728.)  The VRM determination is based on the VRI class and other resource values in the RMP's.  (OWEF 5728.)  The assignment of VRM classes is based on decisions made in RMP's.  (OWEF 5678.)  VRM is "a management tool that portrays the visual management objectives."  (OWEF 5677.)  VRM classes are determined after "careful consideration of VRI class designation, land use and demands, and the resource allocation and/or management decisions made in the applicable land use plan for a given area."  (OWEF 1086.) The designations "set the level of visual change to the landscape that may be permitted for any surface-disturbing activity."  (OWEF 1086.)  "VRI classes are not intended to automatically become VRM class designations."  (OWEF 1086.)  VRI and VRM classes may be different as the VRM classes "should reflect a balance between the protection of visual values and other resource use needs."  (OWEF 1086.) A 2008 memo by the Interior states,

> The BLM Land Use Planning Handbook requires that VRM management classes be identified in land use plans based on inventories of visual resources as well as management considerations for other potential land uses (e.g., wind energy development). The VRM management classes may differ from VRM inventory classes based on the management priorities for land uses in an area. The VRM management classes are intended to establish landscape management objectives for a variety of surface disturbing activities. The VRM management classes are not intended to be used to exclude or preclude land uses, including opportunities for development of wind energy in areas with high wind energy resource potential.

---

[9]An RMP is a land use plan for a geographic region and "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 59 (2004).  In this case, the CDCA would be the applicable RMP.

1   (OWEF 35,361.)

2       There are four VRM Classes: VRM Class I, II, III and IV.  VRM Class III's objective "is to

3   partially retain the existing character of the landscape.  The level of change to the characteristic

4   landscape should be moderate.  Management activities may attract attention but should not dominate

5   the view of the casual observer.  Changes should repeat the basic elements found in the predominant

6   natural features of the characteristic landscape."  (OWEF 5679.)  VRM Class IV's objective is to

7   "provide for management activities which require major modification of the existing character of the

8   landscape.  The level of change to the characteristic landscape can be high.  These management

9   activities may dominate the view and be the major focus of viewer attention.  However, every attempt

10  should be made to minimize the impact of these activities through careful location, minimal

11  disturbance, and repeating the basic elements."  (OWEF 5679.)

12      If there is an RMP without an approved VRM class, interim management classes are

13  established.  (OWEF 5679; 5727.)  An interim VRM has two distinct requirements that it be limited

14  to the area affected by the project and the VRM classes "will reflect the management decision made

15  in existing RMP's."  (OWEF 5679; 5696.)

16      The third step in the VRM process is to provide timely inputs into the proposed surface

17  disturbing project to ensure that the VRM objectives are met.  (OWEF 5728.)

18      In this case, since the CDCA does not have an RMP approved VRM objective, (OWEF 530;

19  1087), BLM must establish an interim VRM class designation which will be limited to the area affected

20  by the project and "will reflect the management decision made in existing RMP's."  (OWEF 5679;

21  5696.)

22      As to the first step, BLM conducted an inventory of the project area and designated sites as

23  either VRI Class II or VRI Class III.  (OWEF 1088-1092; 2443.)  As to the second step in establishing

24  an interim VRM class designation, in the Final EIS, BLM determined that the Project would be a VRM

25  Class IV designation.[10]  (OWEF 1483-84.)

26

27      [10]  The final EIS states that the CDCA Plan does not have "Resource Management
    Plan-approved VRM objectives, and this planning effort is establishing an interim class that conforms
28  with the land use allocation in the existing plan. The existing plan allocation allows for renewable
    energy development in MUC-L (Limited), and this level of (wind) development can only conform with

The parties dispute whether the Project was properly designated an interim VRM Class IV by BLM.  Plaintiff argues that the BLM improperly changed the applicable management standard from Class III to Class IV days before executing the ROD for the sole purpose of facilitating approval of a non-compliant project.  It contends that BLM acted arbitrarily and capriciously when it made last minute change in the VRM class designation from a Class III to Class IV.  (OWEF 46245, 46236.)  In addition, Plaintiff asserts that BLM's VRM process is also arbitrary and capricious since it consistently determined at least since 2008 that the project area is subject to an Interim VRM Class III designation.  Lastly, Plaintiff contends that in violating the VRM standards, Interior violated the CDCA plan by failing to ensure that culturally sensitive scenic values on Class L lands are not "significantly diminished."

Defendants argue that the record does not show that the project had a final designation of a VRM Class II or III but the Project site has a final interim designation of VRM Class IV.  BLM admits that initially it designated the project site as interim VRM Class III but ultimately determined that an interim VRM Class IV was appropriate due to the site's wind energy potential.  (OWEF 46246.)  Therefore, BLM claims it was not precluded from changing the interim VRM classification before the final EIS.

Although VRM class determinations in an RMP are "more than mere[] guidelines" and "binding", <u>Southern Utah Wilderness Alliance et al.</u>, 144 IBLA 70, 85-86 (1998), Plaintiff has not shown that an *interim* VRM class cannot be altered during the Plan approval process prior to a final EIS.  In <u>Southern Utah Wilderness Alliance</u>, there was a conflict between the VRM Class II designation and the RMP.  144 IBLA at 86.  The RMP intended to allow oil and gas leasing in the area proposed even if the activities resulted in adversely affecting the existing visual resources.  144 IBLA at 86.  However, the VRM Cass II designation required maintaining the status quo as to visual resources.  <u>Id.</u> at 86.  The IBLA explained that the BLM should have changed the VRM classification to Class III

_____

interim Class IV objectives. Nevertheless, the overall goal remains to mitigate visual impacts so that any adverse contrasts can be minimized while meeting the purpose of the project." (OWEF 1484.) The EIS also states that the project would result in a long-term visual alteration of landscapes; however, the majority of the actual land disturbance would take place on BLM-administered lands to be managed under an Interim VRM Class IV designation.  (OWEF 1483.)

[12cv1167-GPC(PCL)]

1    when it realized with the Draft RMP/EIS that the proposed project would not conform to the proposed

2    VRM class designation. Id. at 85.  The case stands for the proposition that VRM class designation can

3    be changed during the RMP process prior to finalization. Id.  Although the instant case does not

4    concern the RMP process, the same reasoning can be applied.  Here, the *interim* VRM class designation

5    was changed prior to the final EIS.  Therefore, the change to a VRM Class IV designation in the final

6    EIS would be proper and made it final.  Moreover, Plaintiff has not presented any legal authority to

7    support its argument that an interim VRM cannot be altered prior to the issuance of a final EIS.

8           Plaintiff also argues that since a prior determination made on lands encompassing the OWEF

9    project was assigned a VRM Class III designation, the Ocotillo Project should also be designated VRM

10   Class III.  Plaintiff contends that Ocotillo in its May 2012 Final Plan of Development established an

11   interim VRM classification when it analyzed the Sunrise Powerlink, a transmission line approved by

12   BLM in 2009 that crosses OWEF project lands.  (OWEF 530-31.)  As Federal Defendants argue, it is

13   irrelevant that the applicant believed an Interim VRM Class III designation applied because the BLM

14   is tasked with the responsibility of making the VRM class designation.  Moreover, an interim VRM

15   class designation must be limited to the area affected; therefore, although the Sunrise PowerLink

16   transmission line may touch OWEF lands, it does not encompass the area for the OWEF Project and

17   should not be used as a guide for the VRM class designation.

18          Plaintiff further contends that the Project violates the CDCA plan by failing to ensure that

19   sensitive scenic values on Class L lands are not "significantly diminished."  As discussed above, the

20   Court concluded that the BLM's decision to the allow the Project on Class L lands was not arbitrary,

21   capricious or an abuse of discretion.  In the final EIS, the BLM conducted a thorough analysis of the

22   visual resource impacts of the Project.  (OWEF 1483-1502; 2411-45.)  As a result, it concluded that

23   the VRM Class IV designation was appropriate.  Accordingly, Plaintiff has not shown that the BLM's

24   decision to designate the Project a VRM Class IV was arbitrary, capricious or an abuse of discretion.

25          In its reply, Plaintiff summarily argues that the Project is not consistent with any state or local

26   visual management standards.  (OWEF 1093.)  Defendants argue that state and local law do not provide

27   binding standards that drive land use decisions.  43 U.S.C. § 1765(a) provides that any right-of-way

28   granted by the Secretary "shall contain . . . terms and conditions which will . . . require compliance with

1   State standards for . . . environmental protection . . . if those standards are more stringent than

2   applicable Federal standards."  43 U.S.C. §  1765(a).

3         Plaintiff cites to a table concerning Consistency with Regulations, Plans, and Standards where

4   for goal number 7 of visual resources under the Imperial County General Plan, the proposed project

5   would result in "significant visual impacts." (OWEF 1093.) However, a determination of a "significant

6   visual impacts" does not equate non-compliance with local standards.  Moreover, in Appendix K of the

7   final EIS concerning General Plan Policy Consistency Analysis, it addresses the same goal number 7

8   under the Imperial County General Plan.  (OWEF 2712.)  The analysis states that "[a]s discussed in

9   Section 4.18, Visual Resources, the OWEF would introduce prominent man-made structures into the

10  desert landscape.  Please note that only one wind turbine would be located in the area under the

11  jurisdiction of Imperial County." (OWEF 2712.)  Plaintiff has not demonstrated that the Project is not

12  consistent with any state or local visual resource standard.

13        Based on the above, the Court concludes that the BLM's decision to designate the Project a

14  VRM Class IV was not arbitrary, capricious or an abuse of discretion.  See 5 U.S.C. § 706(2)(A).

15        **3.   Unnecessary and Undue Degradation of the Public Lands**

16        Plaintiff further asserts the Project will permanently and unnecessarily degrade culturally

17  significant lands that qualify as a Traditional Cultural Property ("TCP"), a culturally significant scenic

18  viewshed, and habitat for sensitive biological plants and species on lands that have been affirmatively

19  designated for protection as Class L lands in the CDCA Plan.  It also contends that the degradation is

20  unnecessary because it did not evaluate whether Class M or I lands are available for the applicant's

21  development and the degradation is undue because the project is not consistent with the level of

22  protection required by the CDCA and applicable VRM standards.

23        Defendants argue that the Project will not result in unnecessary or undue degradation of the

24  public lands as the FLPMA requires that the CDCA be a multiple-use, sustained yield plan and

25  extensive mitigation measures were implemented to avoid or reduce any adverse impacts.  They also

26  argue that the BLM considered alternative project sites but found them infeasible or impracticable for

27  wind energy development.  (OWEF 907-08.)  BLM even considered private land alternatives.  (OWEF

28  907-08.)  Defendants reject the suggestion that they should have considered alternate sites within the

25 million acre expanse of the CDCA and argue that they are entitled to identify parameters for alternate sites.  Cf. Idaho Conservation League v. Mumma, 956 F.2d 1508, 1522 (9th Cir. 1992) (agency is entitled to identify some parameters to plan standards for generating alternatives).

BLM is required to take "any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  The BLM has a "'great deal of discretion in deciding how to achieve' these objectives . . . because it does not specify precisely how the BLM is to meet them, other than permitting the BLM to manage public lands by regulation or otherwise." Gardner v. U.S. Bureau of Land Management, 638 F.3d 1217, 1222 (9th Cir. 2011) (citation omitted) see also S. Fork Bank Council of W. Shoshone of Nev. v. U.S. Dept. of Interior, 588 F.3d 718, 724-25 (9th Cir. 2009) (BLM action was not arbitrary or unreasonable in approving mining projects despite some adverse visual impacts).

The ROD discusses the issue of unnecessary or undue degradation of the Project.  (OWEF 130-31.)  The BLM concluded that the Project will not unnecessarily or unduly degrade the public lands. (OWEF 131.)  It explained the measures it took to prevent any unnecessary and undue degradation of the lands. (OWEF 130.)  As discussed above, numerous mitigation measures are mandated in the ROD to protect the different resource values.  (OWEF 421-455; see also OWEF 264-85 (Historic Property Treatment); 308-19 (Buried Sites Sensitivity Model and Buried Sites Testing Plan); 20498-530 (Burrowing Owl Migration and Monitoring Plan); 681-720 (Habitat Revegetation Plan); 723-799 (Golden Eagle Conservation Plan); 326-338 (NAGPRA Plan of Action); 376-416 (Environmental and Construction Compliance Monitoring Plan)).  Therefore, the Court concludes that the BLM did not act arbitrarily, capriciously or abuse its discretion when it determined that the Project will not result in the unnecessary and undue degradation of the public lands.  See 5 U.S.C. § 706(2)(A).

**D.      National Environmental Protection Act ("NEPA")**

Plaintiff presents four arguments that the Federal Defendants violated NEPA.  First, Plaintiff contends that BLM failed to analyze its "priority" renewable energy projects in the CDCA in a single EIS.  Second, Plaintiff asserts that BLM failed to take a "hard look" at the cumulative effects of the OWEF Project in conjunction with past, present and future projects.  Third, Plaintiff argues that BLM failed to examine the indirect growth-inducing effects of the Project.  Lastly, it maintains that BLM

[12cv1167-GPC(PCL)]

failed to take a "hard look" at whether the OWEF Project would conform to local law.

NEPA requires agencies considering "major Federal actions significantly affecting the quality of the human environment" to prepare and issue an environmental impact statement ("EIS"). Brong, 492 F.3d at 1132 (citing 42 U.S.C. § 4332(C)). The statement must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The Court's role is to ensure that the agency took a "hard look" at the potential environmental consequences of the proposed project. Brong, 492 F.3d at 1132 (citation omitted). "We review an EIS under a rule of reason to determine whether it contains a 'reasonably thorough discussion of probable environmental consequences.'" Selkirk Conserv. Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003). The court does not substitute its judgment for that of the agency. Id. NEPA does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results. Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).

### 1.   Single EIS

NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS. Sierra Club v. Penfold, 857 F.2d 1307, 1320-21 (9th Cir. 1988) (citations omitted). "[W]here several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS." City of Tenakee Springs v. Clough, 778 F.2d 1308 1312 (9th Cir. 1990) (citations omitted). In Clough, the projects involved timber harvest operating plans which were all similar projects concerning old growth timber harvesting. Id.

A single EIS is required when the "projects are 'connected,' 'cumulative,' or 'similar' actions under the regulations implementing NEPA." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir. 2002) (citing 40 C.F.R. § 1508.25). "Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative, and similar actions must be considered together to prevent an agency from 'dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial

impact.'" Id. (quoting Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985)).

We apply an "independent utility" test to determine whether multiple actions are so connected as to mandate consideration in a single EIS. The crux of the test is whether "each of two projects would have taken place with or without the other and thus had 'independent utility.'" Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th Cir. 2006) (citing Wetlands Action Network v. U.S. Army Corps of Eng'rs., 222 F.3d 1105, 1118 (9th Cir. 2000) (abrogated on other grounds by Wilderness Co. v. U.S. Forest Serv., 530 F.3d 1173 (2011)). "When one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes." Id. (citing Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir. 2002)).

In one case, the Ninth Circuit held that five potential logging projects in the same watershed were cumulative and had to be evaluated in a single EIS, where they were reasonably foreseeable and "developed as part of a comprehensive forest recovery strategy." Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215 (9th Cir. 1998). In Thomas v. Peterson, the court held that a logging project and a road to facilitate the logging had to be considered in a single EIS because "the timber sales [could not] proceed without the road, and the road would not be built but for the contemplated timber sales." Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985).

Plaintiff argues that the BLM violated NEPA by failing to analyze its "priority" renewable energy projects in the CDCA in a single EIS. Plaintiff asserts that in October 2010, Interior approved six "priority" renewable energy projects on 26,397 acres of BLM managed CDCA land. In 2011, Interior approved two "priority" renewable energy projects on 16,298 acres of BLM-managed CDCA land and five other "priority" projects located on 7,319 acres of CDCA land that required BLM approval for transmission lines or access. Plaintiff maintains that these projects should have been analyzed in a single EIS. Defendants contend that NEPA does not require BLM to analyze all renewable energy projects across 25 million acres of land in a single EIS.[11]

Although Plaintiff contends that the BLM should have issued a single EIS as to all priority

---

[11]Defendant contends that it prepared a programmatic EIS for wind, solar and geothermal programs generally. (OWEF 19070.)

1    projects it has affirmatively designated within the CDCA , it does not address or show how all these

2    projects are connected, cumulative or similar.  See Dombeck, 304 F.3d at 894.  Accordingly, Plaintiff

3    has not shown that the Interior's failure to analyze its "priority" renewable energy projects in a single

4    EIS was arbitrary, capricious or an abuse of discretion.  See 5 U.S.C. § 706(2)(A).

5                **2.      Cumulative Effects with Past, Present, and Future Actions**

6            Where several actions have a cumulative or synergistic environmental effect, the consequence

7    must be addressed in an EIS.  City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990).

8    Cumulative impact is defined as "the impact on the environment which results from the incremental

9    impact of the action when added to other past, present, and reasonably foreseeable future actions . . .

10   Cumulative impacts can result from individually minor but collectively significant actions taking place

11   over a period of time."  40 C.F.R. § 1508.7.  The Ninth Circuit noted two "critical features of a

12   cumulative effects analysis."  Brong, 492 F.3d at 1133.  A cumulative effect must "not only describe

13   related projects but also enumerate the environmental effects of those projects.  Second, it must

14   consider the interaction of multiple activities and cannot focus exclusively on the environmental

15   impacts of an individual project."  Id. (citations omitted).

16           The geographic scope, in addition to the extent and effect of the cumulative factors "is a task

17   assigned to the special competency of the appropriate agencies."  Kleppe v. Sierra Club, 427 U.S. 390,

18   414 (1976) (concluding that Interior's choice to limit scope of comprehensive statement was not

19   arbitrary despite Respondent's argument that a comprehensive statement on the whole region is

20   required because all coal-related activity is programmatically, geographically and environmentally

21   related); Neighbors of Cuddy Mtn. v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[u]nder NEPA,

22   we defer to an agency's determination of the scope of its cumulative effects review.")  The geographic

23   scope "requires a complicated analysis of several factors, such as the scope of the project considered,

24   the features of the land, and the types of species in the area."  Selkirk Conserv. Alliance v. Forsgren,

25   336 F.3d 944, 958 (9th Cir. 2003).  Agencies have "discretion to determine the physical scope used for

26   measuring environmental impacts" so long as they do not act arbitrarily and their "choice of analysis

27   scale . . . represent[s] a reasoned decision."  WildWest Institute v. Bull, 547 F.3d 1162, 1173 (9th Cir.

28   2008) (quoting Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)).

However, the "choice of analysis scale must represent a reasoned decision and cannot be arbitrary." Idaho Sporting Cong., Inc., 305 F.3d at 973.

First, the parties dispute the geographic scope of the cumulative effects.[12] Plaintiff asserts that the geographic scope should be current, past and foreseeable projects on Class L lands throughout the CDCA. Defendants contend that because of the ecologically and geographically diversity of Class L lands and disparate uses permitted, BLM determined the geographic scope based on each resource category encompassing nineteen (19) categories. (OWEF 1158-1180; 1178-80 (Table 4.1-2).) They also assert that the Court should defer to the agency's decision on geographic scope.

As to geographic scope, the FEIS explains,

> the BLM has identified the California desert as the largest area within which cumulative effects should be assessed. However, within the desert region, the specific area of cumulative effect varies by resource. For each resource, the geographic scope of analysis is based on the topography surrounding the OWEF and the natural boundaries of the resource affected, rather than jurisdictional boundaries. The geographic scope of cumulative effects often extends beyond the scope of the direct effects, but not beyond the scope of the direct and indirect effects of the Proposed Action and alternatives. Table 4.1-2 identifies the relevant geographic scope for each discipline's analysis of cumulative impacts.

(OWEF 1161-62.) As to each resource area, the FEIS identifies and provides an explanation as to the geographic scope. (OWEF 1177, 1181-1634.)

As to cultural resources, the BLM determined that the geographic scope of the agency's cumulative analysis to be the APE[13] plus a 10 mile buffer. (OWEF 1244.) The FEIS explained that

> [t]his is a large enough area to encompass any effects of the OWEF on cultural resources that may combine with similar effects caused by other projects and provides a reasonable context wherein cumulative actions could affect cultural resources. For instance, the visibility of the proposed OWEF from surrounding areas could alter the context of nearby historic and prehistoric properties, or affect certain ethnographic

---

[12]Plaintiff argues that BLM acknowledges that the geographic scope of analysis is Class L lands throughout the CDCA and cites to OWEF 1295 which states that the "geographic extent for the analysis of cumulative impacts related to MUC designations are the local and regional BLM lands under the CDCA Plan." The FEIS designation relates to MUC designation and not the cumulative impact on the different resources. Therefore, the BLM's choice of geographic scope as to the MUC designation is not applicable to the cumulative impact on specific resources categories.

[13]Area of Potential Effects ("APE") is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." 36 C.F.R. § 800.16(d).

1    values attributed to the area. Because the visibility of the proposed OWEF diminishes
2    substantially beyond ten miles (see Figure 4.18-1, Project Viewshed Map), a ten-mile
     radius around the OWEF site represents an appropriate geographic limit for the
3    cumulative impact analysis for cultural resources.

4    (OWEF 1244.)

5         BLM carefully considered the issue and provided a reasoned explanation as to the geographic

6    scope.  Accordingly, the Court defers to the BLM's determination of the geographic scope of the

7    cumulative analysis.

8         Next, the agency must conduct an analysis of the impact of the proposed project when added

9    to past, present and reasonably foreseeable actions within the selected geographical area.

10   "Consideration of cumulative impacts requires some quantified or detailed information" that results in

11   a "useful analysis." Ctr. for Environ. Law and Policy v. U.S. Bureau of Reclamation, 655 F.3d 1000,

12   1007 (9th Cir. 2011); see also Klamath-Siskiyou Wildlands Ctr., 387 F.3d 989, 993 (9th Cir. 2004).

13   General statement about potential effects and some risk is not considered a hard look; however, an

14   agency "may characterize the cumulative effects of past actions in the aggregate without listing every

15   past project that has affected the area." Ctr. For Environ. Law and Policy, 655 F.3d at 1007.

16        "An agency must take a 'hard look' at all actions.  An EA's analysis of cumulative impacts

17   'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate

18   analysis about how these projects, and differences between the projects, are thought to have impacted

19   the environment.'" Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dept. of Interior, 608 F.3d 592,

20   603 (9th Cir. 2010) (citing Lands Council v. Powell, 395 F.3d 1019, 1028, (9th Cir. 2005)).  General

21   statements about "possible effects" and "some risk" do not amount to a "hard look" without a

22   justification why more detailed information could not be provided.  Id. at 604.

23        Plaintiff argues that the BLM violated NEPA by failing to adequately evaluate or discuss the

24   cumulative effect of past, present and foreseeable projects on the resources that are to be protected on

25   Class L lands including but not limited to cultural resources, Native American values and wildlife.

26   Defendants argue that BLM considered numerous projects and anticipated cumulative effects.

27        In the FEIS, each resource value is analyzed separately.  (OWEF 1158-1634.)  The FEIS

28

contains many pages of analysis as to wildlife resources, (OWEF 1581-1635), and cultural resources, (OWEF 1214-1258).  Within each resource, BLM addresses the cumulative impact.  (OWEF 1158-1634.)  Table 4.1-1 provides a list of current and reasonably foreseeable projects including other proposed or approved renewable energy projects, various BLM-authorized actions/activities, proposed or approved projects within the counties' jurisdiction and other actions that Lead Agencies consider reasonably foreseeable.  (OWEF 1163-1176.)   Then Table 4.1-2 lists the cumulative projects within the geographic scope of cumulative analysis for each resource area.  (OWEF 1179-1180.)

As to wildlife resources, Table 4.1-2 states the geographic scope of the resource area, the wildlife elements to consider and a list of fourteen current and foreseeable projects.  (OWEF 1180.)  Within the wildlife resources section, the FEIS provides a cumulative analysis.  (OWEF 1614-1622.)  In addition to the cumulative analysis, the FEIS also contains a table of the Estimated Impacts as to each current and reasonably foreseeable projects as to specific wildlife species within the geographic scope.  (OWEF 1617-18 (Table 4.21-1.))  The FEIS further discusses in detail the wildlife elements to consider in Table 4.1-2 with a quantitative analysis of the cumulative impact as to the barefoot banded gecko, burrowing owl, golden eagle, migratory birds and bat species, peninsular bighorn sheep, and other special status wildlife species.  (OWEF 1619-1622.)  The cumulative analysis as to the wildlife resources provide quantified and detailed information that is useful.  See Ctr. for Environ. Law and Policy, 655 F.3d at 1007.

As to the cumulative impacts on cultural resources, (OWEF 1244-47), Table 4.1-2 states the geographic scope of the cultural resource area, which is described to be the APE plus a 10 mile radius around the site.  (OWEF 1177.)  The table also lists the cultural elements to consider and a list of ten current and foreseeable other projects.  (OWEF 1177.)  The cumulative impact analysis in the cultural resources category states that the cumulative impact analysis is "focused on the proposed action's potential contributions to other types of impacts to cultural resources in the area, particularly the TCP."[14]   (OWEF 1244.)   Therefore, BLM's focused the cumulative impact analysis on

---

[14]Traditional Cultural Property ("TCP") is a culturally significant scenic viewshed, and habitat for sensitive biological plants.  "Examples of TCPs for Native American communities may include natural landscape features, trail systems, places used for ceremonies and worship, places where plants

viewshed/landscape-level impacts and not physical impacts as the Project is not expected to cumulatively contribute to physical impacts. (OWEF 1244.) Of the ten projects listed as current and foreseeable projects, four projects have already published their EIS or EIR documents. (OWEF 1245.) Table 4.4-2 provides the cumulative projects within the Cultural Resources Geographic Extent. (OWEF 1246.) The table provides the project name, location, project type, project description and lists the number of cultural sites. (OWEF 1246.) The FEIS also contains a cumulative analysis as to each phase of the project - construction; operation and maintenance and decommissioning. As to the construction phase, the FEIS provides the adverse affect of the proposed Project and then provides a cumulative analysis. For example, the proposed Project will alter culturally important landscapes through the construction of wind turbine generators which are visually prominent structures. (OWEF 1246.) As to cumulative effects, "[o]ther projects with visually prominent features, such as the SRPL transmission line, will also contribute to changes in visual conditions and therefore, will also contribute to cumulative impacts on culturally important views and landscapes." (OWEF 1247.)

Moreover, in the visual resources analysis, the FEIS conducts a detailed analysis as to the cumulative impacts of past, existing and reasonably foreseeable projects. (OWEF 1495-99.) It provides an explanation of the geographic scope which it divided into two types of cumulative impacts: local cumulative impacts to include impacts within the immediate project viewshed, and regional cumulative impacts to include impacts beyond the immediate project viewshed. (OWEF 1496.) Then it discusses, with detail, the existing cumulative conditions as to three projects with OWEF. (OWEF 1496.) Next, it addresses the reasonably foreseeable projects on a local and regional scale. (OWEF 1497-98.) Lastly, the FEIS/FEIR conducts a cumulative analysis on each phase of the project, from construction to decommissioning. (OWEF 1498-99.) Mitigation measures were also implemented to revegetate disturbed soil; provide for specific instruction on the design and installation of exterior lighting to limit illumination of the project; reduce visual contrast with substation and ancillary facilities by blending the colors of the facilities with the landscape; reduce potential view blockage and visual

---

are gathered that are used in traditional medicines and ceremonies, places where artisan materials are found, and places and features of traditional subsistence systems, such as hunting areas." (OWEF 928.)

contrasts of structures by consulting with affected property owners; and other measures. (OWEF 1500-02.)

The Court concludes that the cumulative analysis as to cultural resources, which also includes visual resource impacts, was properly evaluated and discussed. The Court concludes that the BLM's cumulative analysis of past, present and foreseeable projects as to cultural resources was not arbitrary, capricious or an abuse of discretion.

### 3. Growth-Inducing Effects

40 C.F.R. § 1508.8(b) describes indirect effects as effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

Plaintiff argues that BLM failed to examine the indirect growth-inducing effects of the Project as OWEF will lead to the development of additional wind energy developments adjacent to the Project site. In support of its argument, Plaintiff directs the Court to a map prepared by BLM that identify "authorized Type II Wind Energy Projects" and "Pending Wind Energy ROW Application" adjacent to the OWEF Project. (See OWEF 156.) Plaintiff appears to believe that these are new wind energy development projects. In response, Defendants argue that the EIS discusses growth-inducing impacts concerning jobs, housing, population, land use and other socio-economic factors. (OWEF 1638-39.) BLM contends that the map Plaintiff presents depicts the total area that Ocotillo had originally applied for wind energy facility testing and not applications by other entities. (OWEF 156.) BLM also notes that the amendment to the CDCA designated about 2,285 acres originally proposed for development by Ocotillo as unsuitable for future wind energy development. Therefore, they argue that the idea that the Project will "induce" other similar wind project fails.

Here, the FEIS contains an analysis of growth-inducing impacts and concludes that the OWEF and the alternatives would not result in direct population growth or residential or commercial development. (OWEF 1639.) Plaintiff has not provided facts to dispute the BLM's conclusion about

indirect growth-inducing effects of the Project.  Therefore, the Court concludes that the BLM's FEIS analysis of indirect growth inducing impacts is not arbitrary, capricious or an abuse of discretion.  See 5 U.S.C. § 706(2)(A).

### 4.       Conformity with Local Law

The regulations provide that in order to "better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned).   Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law."  40 C.F.R. § 1506.2(d).  The CDCA Plan also requires that energy projects "conform to local plans whenever possible."  (OWEF 6000; see also OWEF 31605.)

Plaintiff argues that the BLM failed to take a "hard look" at whether the Project would conform to local law in violation of NEPA.  Defendants contend that the BLM fully analyzed the Project's consistency with local laws. They contend that Imperial County was the California Environmental Quality Act lead agency on the Project and was actively involved in its environmental review, including an analysis of whether the Project was in conformance with local laws.

The administrative record demonstrates that the BLM considered the inconsistencies with local law and reasonably concluded there was no conflict.  Plaintiff does not address the numerous provisions in the final EIS and ROD concerning the Project's consistency with local laws and regulations.  The State of California determined there were no inconsistencies between the Project and state or local laws. (OWEF 475-76 (letter from Governor's office); OWEF 139.)  The final EIS encompasses a General Plan Policy Consistency Analysis which addresses the consistency between the Project and local regulations and laws.  (OWEF 2708-725); (see also OWEF 977-979) (discussion of the Imperial County General Plan); (OWEF 19000-19069) (agreement between Ocotillo and County for Ocotillo to comply with local laws); (OWEF 920-21) (consistency with air pollution control).

Accordingly, Plaintiff has failed to show that the BLM failed to analyze the Project's consistency with local laws under NEPA.

/ / / /

[12cv1167-GPC(PCL)]

**E.    Archaeological Resources Protection Act ("ARPA")**

The Archaeological Resources Protection Act ("ARPA") prohibits the unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources unless a permit is issued.  16 U.S.C. § 470ee(a).  The regulations concerning the ARPA provides,

> [a]ny person proposing to excavate and/or remove archaeological resources from public lands or Indian lands, and to carry out activities associated with such excavation and/or removal, shall apply to the Federal land manager for a permit for the proposed work, and shall not begin the proposed work until a permit has been issued.

43 C.F.R. § 7.5(a).

However,

> [n]o permit shall be required under this part for any person conducting activities on the public lands under other permits, leases, licenses, or entitlements for use, when those activities are exclusively for purposes other than the excavation and/or removal of archaeological resources, even though those activities might incidentally result in the disturbance of archaeological resources.

Id. § 7.5(b).  The regulations also require notification and consultation with the Indian tribe if the issuance of the permit may result in harm or destruction of any Indian tribal religious or cultural site on public lands.  Id. § 7.7(a).

According to the BLM Manual, if consultation pursuant to Section 106 of the NHPA occurred with respect to the proposed archaeological work, BLM does not need to consult separately under ARPA.  (BLM Manual 8150.13A2e) (notification under 43 C.F.R. § 7.7(a) is not required when the "tribe has already been consulted about the proposed archaeological work pursuant to Section 106 of the National Historic Preservation Act . . . .").

Plaintiff asserts that BLM violated ARPA by allowing excavation and removal of artifacts without a valid permit between May 11, 2012 and July 10, 2012, and then by issuing a permit on July 10, 2012, without consulting the Tribe.  Federal Defendants argue that a permit was not required in this case because the Project's purpose is to provide reliable source of wind energy and not to excavate or remove archaeological resources.  Although not required, BLM issued ARPA permits throughout the course of the Project's design and construction.  (POST ROD 12081; 12088; 863.)  Moreover, Defendants argue that there is no duty to consult the Tribe where no permit was required.

1    Ocotillo states that on May 11, 2012, the BLM issued an ARPA Fieldwork Authorization for

2    the OWEF Project for work conducted from May 8, 2012 to May 8, 2013. (POSTROD 12155-57.) It

3    was issued to Tierra, the entity that led the archaeological fieldwork during construction. (POSTROD

4    12155-57.)  Therefore, Ocotillo argues there is no merit to Plaintiff's claim.

5    On May 11, 2012, Interior issued a  Fieldwork Authorization which was issued to Tierra

6    pursuant to 16 U.S.C. § 470cc for the period from May 8, 2012 to May 8, 2013.  (POSTROD 12155.)

7    The nature of the work in the Fieldwork Authorization is described as: "[t]his Fieldwork Authorization

8    request is required for the construction monitoring for the Ocotillo Wind Express project . . . needed

9    to complete the previously approved Ocotillo Wind Energy Project . . . .This effort may necessitate the

10   collection and curation of artifacts that may be uncovered or potentially damaged during construction

11   activities. Monitors will observe construction and will be responsible for maintaining the integrity of

12   any previously recorded sites surrounding the immediate work area." (POSTROD 12155.)

13   Plaintiff does not address this Fieldwork Authorization in its reply.  It appears a permit was

14   issued pursuant to 16 U.S.C. § 470ee(a).  Therefore, the Court concludes that Plaintiff's claim of a

15   ARPA violation is without merit.

16   **F.      Right of Way Approvals**

17   Plaintiff argues that BLM has failed to comply with the terms and conditions of the ROD, right

18   of way and mitigation measures in violation of the APA. (Dkt. No. 80-1 at 32; 118 at 28-30.)  It also

19   contends that failure to enforce compliance violates its duty to protect resources on Class L lands and

20   to prevent the unnecessary and undue degradation of public land and is an arbitrary, capricious, abuse

21   of discretion.  Defendants contend that Plaintiff has failed to assert a cognizable challenge to post-ROD

22   conduct pursuant to the APA.

23   In Norton, the United States Supreme Court held that permitting use of off road vehicles

24   ("ORV") in certain wilderness study areas ("WSA") did not violate its mandate under FLPMA to

25   manage WSAs so as not to impair areas for preservation as wilderness.  Norton v. Southern Utah

26   Wilderness Alliance, 542 U.S. 55, 66-67 (2004).  Each WSA is managed pursuant to a land use plan.

27   Id. at 60.  Plaintiff alleged that the BLM had violated its nonimpairment obligation under the FLPMA

28

[12cv1167-GPC(PCL)]

by allowing degradation in certain WSAs and that BLM had failed to implement provisions in the land use plans relating to ORV use. Id. at 60-61. Under the "failure to act" provision in the APA, 5 U.S.C. § 706(1), the "failure to act" is a "failure to take an *agency action*" and limited to a "*discrete* action." Id. at 62-63 (emphasis in original). Second, agency action can be compelled if the action is "legally *required*." Id. (emphasis in original). As to a "failure to act" allegation, the Court explained that it constitutes a failure to take one of the agency actions of "agency rule, order, license, sanction or relief." Id. at 62. The APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'" Id. at 64 (citing Attorney General's Manual on the Administrative Procedure Act 108 (1947)). The principal purpose of the APA limitation is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Id. at 66.

In this case, Plaintiff challenges post-ROD decision or actions. First, Plaintiff contends that BLM failed to comply with the terms of the MOA by not consulting with the Tribe in violation of Section 106 of the NHPA and NAGPRA[15]. Second, it contends that BLM violated ARPA by allowing excavation and removal of artifacts without a valid permit and without consulting the tribe violating ARPA and the APA. Third, it argues that BLM has not enforced conditions required by the Project's ROD, right of way and mitigation measures.

As a threshold matter, Plaintiff's "failure to act allegation," concerning implementation of the MOA, NAGRA Plan of Action, the ROD, ROW and mitigation measures, is not cognizable under the APA as Plaintiff does not allege a failure to take one of the agency actions such as a rule, order, license, sanction or relief. See Norton, 542 U.S. at 63-66. Moreover, to the extent that Plaintiff alleges the ARPA violation under APA, Plaintiff has not asserted the "final agency" action that is subject to the

---

[15]Plaintiff's motion for summary judgment presents a conclusory allegation that BLM failed to consult the Tribe under NAGPRA in violation of 43 C.F.R. §§ 10.3(c)(1) and 10.5. Plaintiff cites to the Bathke Declaration which is not part of the moving papers as the Court denied Plaintiff's motion to supplement the record without prejudice. Plaintiff's opposition and reply do not address this allegation. (See Dkt. Nos. 118, 120.) The Court concludes that Plaintiff has failed to show that NAGPRA was violated. Moreover, as discussed, the NAGPRA claim concern post-ROD claims that is not subject to the APA.

[12cv1167-GPC(PCL)]

claim.  Accordingly, the Court concludes that Plaintiff's post-ROD claims under the APA are without

merit.

### Conclusion

Based on the above, the Court DENIES Plaintiff's motion for summary judgment; GRANTS

Federal Defendants' motion for summary judgment; and GRANTS Defendant-Intervenor's motion to

dismiss and for summary judgment.  (Dkt. Nos. 80, 111, 115.)

IT IS SO ORDERED.


DATED:  February 27, 2013


HON. GONZALO P. CURIEL
United States District Judge

[12cv1167-GPC(PCL)]